[No. E050452. Fourth Dist., Div. Two. Aug. 24, 2011.]

MICHAEL T. GUTIERREZ et al., Plaintiffs and Appellants, v.
COUNTY OF SAN BERNARDINO, Defendant and Respondent.

834

## Counsel

Graham Vaage, Arnold K. Graham and Alexei Brenot for Plaintiffs and Appellants.

Graves & King, Patrick L. Graves, Harvey W. Wimer III and Dennis J. Mahoney for Defendant and Respondent.

## Opinion

**KING, J.**—The present action is brought by plaintiff homeowners, Michael T. Gutierrez, Louise Gutierrez, Martin Gutierrez, Jr., Carmen V. Gutierrez, Anthony Bieggar, Rosa Bieggar, Frank Magdaleno, Carol Magdaleno, Ulric Presta, Nikki Presta, Chris E. Scott, and Michelle L. Scott, for inverse condemnation against defendant County of San Bernardino (the County). The alleged takings occurred during rainstorms in December 2003 and October 2004. On both occasions, plaintiffs' properties were inundated with water, dirt, and debris flowing from the mountainous area north of their properties.

Plaintiffs' properties are located along Greenwood Avenue in Devore, just north of Interstate 15. The area, while residential, is rural in nature. Greenwood Avenue runs generally in a north/south direction with Kenwood Avenue being the southern terminus, and mountains to the north. At the time of the floodings, approximately 80 percent of Greenwood Avenue was paved; the 20 percent closest to the mountains (known as the Greenwood alignment) was unimproved dirt, not suitable to drive on. The paved portion of Greenwood Avenue appears to be about 30 feet wide with no storm drains. Aerial photographs show a large canyon that drains to the base of the mountains just north of the unimproved Greenwood alignment. There is no flood control infrastructure at the base of the mountains.

In October 2003, the "Old Fire" denuded the mountains north of Devore. On December 25, 2003, it rained. The water flowed out of the mountains and down Greenwood Avenue, carrying with it significant amounts of debris and sediment. The flow caused substantial damage to plaintiffs' residences and property. The following month, the County placed K-rails along both sides of the paved portion of Greenwood Avenue for the purpose of protecting the residents from further damage. In October 2004, more rain hit the area, causing water, debris, and sediment to flow down Greenwood Avenue. Some of the water, debris, and sediment escaped the confines of the K-rails, causing damage to plaintiffs' properties.

# I. INTRODUCTION

## A. *Inverse Condemnation*

■ "Article I, section 19 of the California Constitution permits private property to be 'taken or damaged for public use only when just compensation . . . has first been paid to, . . . the owner.' When there is incidental damage to private property caused by governmental action, but the governmental entity has not reimbursed the owner, a suit in 'inverse condemnation' may be brought to recover monetary damages for any 'special injury,' i.e., one not shared in common by the general public. . . . [Citation.]" (*Locklin v. City of Lafayette* (1994) 7 Cal.4th 327, 362 [27 Cal.Rptr.2d 613, 867 P.2d 724] (*Locklin*).)

Courts have referred to an important policy underpinning inverse condemnation damages as the " 'loss distribution' premise." (See *Holtz v. Superior Court* (1970) 3 Cal.3d 296, 303–304 [90 Cal.Rptr. 345, 475 P.2d 441], fn. omitted (*Holtz*).) As the *Holtz* court explained: The "general rule of compensability [does] not derive from statutory or common law tort doctrine, but instead [rests] on the construction . . . of our constitutional provision. . . . 'The decisive consideration is whether the owner of the damaged property if uncompensated would contribute more than his proper share to the public undertaking.' In other words, the underlying purpose of our constitutional provision in inverse—as well as ordinary—condemnation is 'to distribute throughout the community the loss inflicted upon the individual by the making of public improvements' [citation]: 'to socialize the burden . . .—to afford relief to the landowner in cases in which it is unfair to ask him to bear a burden that should be assumed by society' [citation]." (*Id.* at p. 303.)

■ An action for inverse condemnation lies when there is " 'actual physical injury to real property proximately caused by [a public] improvement as deliberately designed and constructed . . . whether [said physical injury is] foreseeable or not.' " (*Belair v. Riverside County Flood Control Dist.* (1988) 47 Cal.3d 550, 558 [253 Cal.Rptr. 693, 764 P.2d 1070] (*Belair*).) To be a proximate cause, the design, construction, or maintenance of the improvement must be a substantial cause of the damages. (*Arreola v. County of Monterey* (2002) 99 Cal.App.4th 722, 738–739 [122 Cal.Rptr.2d 38].)

## B. *The Parties' Contentions and Procedural Background*

Although plaintiffs asserted claims against the County for inverse condemnation, nuisance, dangerous and defective condition of public property, and

trespass, only the cause of action for inverse condemnation was tried.[1] As to this theory, plaintiffs alleged that during both storms Greenwood Avenue "functioned as intended, designed, constructed and maintained" to channel large portions of storm flows down Greenwood Avenue, allowing the water and debris to escape onto plaintiffs' properties, causing substantial damage. At trial, plaintiffs' basic positions were: (1) Greenwood Avenue, together with the unpaved Greenwood alignment, was a County roadway and, as such, was a public improvement for purposes of inverse condemnation law; (2) the County's installation of the K-rails prior to the October 2004 flood constituted a further public improvement; (3) in both the December 2003 flood and the October 2004 flood, Greenwood Avenue functioned as a storm channel, proximately causing damage to plaintiffs' properties; and (4) under *Albers v. County of Los Angeles* (1965) 62 Cal.2d 250 [42 Cal.Rptr. 89, 398 P.2d 129] (*Albers*), the County is strictly liable for such damage.

The County contended that, as to the December 2003 flood, any damage to plaintiffs' properties was not caused by a public improvement. As for the installation of the K-rails and the October 2004 flood, the County submitted that there was no showing that the K-rails caused any damage over and above the damage that would have occurred in the absence of the K-rails. Further, as to the 2004 flood, the County asserted that strict liability does not apply; instead, its actions are governed by a reasonableness standard under *Locklin*, and that it acted reasonably.

At trial, the issue of damages was bifurcated from that of whether a taking had occurred. Following the presentation of plaintiffs' case-in-chief on the takings issue, the trial court granted a nonsuit as to the claim arising from the December 2003 flood. Following the presentation of the defense case, the court ruled in favor of the County on the remaining claim. In its tentative decision, which became the statement of decision, the court found that as to the December 2003 flood "there was no public improvement that constituted a 'taking.' " As to the October 2004 flood, the court found that the installation of the K-rails was a public improvement and that it caused damage to plaintiffs' properties. The court concluded, however, that strict liability did not apply, and that in considering the various criteria set forth in *Locklin, supra,* 7 Cal.4th at pages 368 and 369, the County acted reasonably.

As presented by the pleadings, the evidence, and the arguments on appeal, the present matter deals with two alleged takings, the first being the initial flood in December 2003, which occurred approximately two months after the Old Fire, and the second being the flood of October 2004.

---

[1] The causes of action for nuisance, dangerous and defective condition of public property, and trespass were dismissed in December 2009 in exchange for a waiver of costs.

As to the 2003 incident, we conclude (1) the Greenwood alignment was not a public improvement for purposes of inverse condemnation, and (2) to the extent the lower, paved Greenwood Avenue was a public improvement, plaintiffs failed to submit any evidence that it was a cause of their injuries.

Relative to the October 2004 flooding, surface water was diverted into a temporary fixed channel consisting of the paved roadway bordered on both sides by K-rails. Although this channel constitutes a public improvement, we hold that the appropriate legal standard to apply is that of reasonableness, and that substantial evidence supports the trial court's conclusion that the County acted reasonably relative to its installation of the K-rails.

We therefore affirm the judgment.

## II. DISCUSSION

### A. *The December 2003 and October 2004 Storms*

Geologically, the Greenwood Avenue area is described as a relatively flat mesa and an alluvial fan. To the immediate north are mountains. A 1937 aerial photograph shows Greenwood Avenue as a dirt road extending northerly to the base of a canyon. There is a deep, incised, natural channel at the bottom of the canyon. The photograph shows no evidence of any manmade dam or other infrastructure. As depicted in the photograph, the unpaved Greenwood Avenue was the primary flow path for water coming from the canyon.

An aerial photograph taken in 1970 also shows the Greenwood alignment and Greenwood Avenue (which was by then paved) to be the primary flow path out of the canyon. Sometime before 2002, fill was placed near the outlet of the canyon, creating a dam for the natural flows coming out of the canyon.[2] Over time, the dam allowed sediment to build up at the outlet of the canyon. Before the Old Fire and the December 25, 2003 rain, water flowed out to the bottom of the canyon, hit the dam, and moved westerly. Plaintiffs' expert testified that he was not aware that any of the plaintiffs sustained any damage to their properties as a result of flooding or debris prior to the fire and the December 25, 2003 incident.

[2] Plaintiffs' expert, Daniel Pradel, testified that he does not know who did the fill work in the channel and that he has never seen any plans or specifications or any grading permits as it relates to the fill. There was no evidence as to who put the fill at the bottom of the channel.

The debris from the December 25, 2003 storm came in two large waves—one in the morning and one in the afternoon. As the initial flow intensified, water moved south down the Greenwood alignment between the uppermost two homes. During the afternoon wave, the dam burst, allowing all of the material to flow down Greenwood Avenue in a very concentrated manner. The water and debris flowed down Greenwood Avenue and inundated adjacent houses.[3]

If the dam had not burst, the owners would have suffered less damage. Two-thirds of the 27,777 cubic yards of debris that came down Greenwood Avenue was attributable to the sediment and debris built up at the manmade fill; one-third came from the upper portions of the canyon. Without the sediment and debris from the dam, most of the material would have spread out and not reached the houses along Greenwood Avenue.

At the end of January 2004, the County installed K-rails along Greenwood Avenue, just off the pavement edge. The purpose of the K-rails was to protect the properties adjacent to Greenwood Avenue by keeping the majority of the debris within the confines of Greenwood Avenue. In addition to the K-rails installed along the paved portion of Greenwood Avenue, a few were installed closer to the mouth of the canyon so that flows would remain in the natural drainage course along the Greenwood alignment.

In the October 2004 flood, Greenwood Avenue served as a storm drain. The K-rails installed on both sides of Greenwood Avenue created a kind of funnel, capturing debris and water and conveying it all down Greenwood Avenue.

B. *The Trial Court Properly Granted a Nonsuit as to the December 2003 Flood*

As to the December 2003 storm, plaintiffs contend the entire length of Greenwood Avenue, including the unimproved dirt alignment, is a public improvement. They submit that, historically, Greenwood Avenue was a natural flow path for water coming from the mountains and, as a public improvement, it should have been improved such that it would carry the water and debris generated by the December 25, 2003 storm. They further contend that the road concentrated and exacerbated the natural flow of water, thereby causing damage to their properties.[4] In both veins, they contend the County is strictly liable.

---

[3] According to a 1975 drainage study, the paved portion of Greenwood Avenue was not constructed to accommodate anticipated flows coming out of the canyon.

[4] While the immediate area of Greenwood Avenue may have been a natural watercourse at one time, the December 2003 flood appears to have involved surface water. It flowed from the mountainous area, onto the unimproved Greenwood alignment, and thereafter to the paved

As to whether there was a public improvement at the time of the December 2003 flood, the parties agree that the paved portion of Greenwood Avenue was a County road and that it had been improved by its paving. It is the unimproved Greenwood alignment that is the bone of contention. At both the trial level and on appeal, a great deal of briefing and argument has been dedicated to whether this unimproved area was a County road. Plaintiffs maintain that the County owned the fee interest underlying the road and had accepted the road into the County road system. The County argues that it merely had an easement, which had not been accepted into its road system. While the evidence may be in conflict on this issue, we do not believe its resolution is crucial to the outcome of the case. As we explain below, even accepting plaintiffs' position that the dirt alignment is a County road, owned in fee and accepted into the County road system, it is nonetheless unimproved raw land that has not been deliberately acted upon by the County and, as such, is not a public improvement for purposes of inverse condemnation.

In viewing numerous photographs in our record, it is evident that the Greenwood alignment is unimproved. Photographs show that at the time of the December 2003 flood there were two houses at the base of the mountains between which the Greenwood alignment was located. To reach each of these homes there were driveways that spurred off from the top of the paved portion of Greenwood Avenue. Neither resident appears to have used the unimproved alignment for access to their properties. Before the floods, the Greenwood alignment appears as nothing more than raw land. No grading had been done and the area was incapable of being used by passenger vehicles. Other than the fact that the County may have been a fee owner of the property, there was no evidence that the County deliberately acted upon the property in any fashion prior to the December 2003 flood.

*Wildensten v. East Bay Regional Park Dist.* (1991) 231 Cal.App.3d 976 [283 Cal.Rptr. 13] is instructive. There, the defendant governmental entity owned undeveloped land known as Wildcat Canyon Regional Park.

---

portion of Greenwood Avenue. As stated in *Keys v. Romley* (1966) 64 Cal.2d 396 [50 Cal.Rptr. 273, 412 P.2d 529]: "Water diffused over the surface of land, or contained in depressions therein, and resulting from rain, snow, . . . is known as 'surface water.' It is thus distinguishable from water flowing in a fixed channel, so as to constitute a watercourse . . . ." (*Id.* at p. 400.) " 'Every landowner must bear the burden of receiving upon his land the surface water *naturally falling upon land above it and naturally flowing to it therefrom,* and he has the corresponding right to have the surface water naturally falling upon his land or naturally coming upon it, flow freely therefrom upon the lower land adjoining, as it would flow under natural conditions. From these rights and burdens, the principle follows that he has a lawful right to complain of others, who, by interfering with natural conditions, cause such surface water to be discharged in greater quantity or in a different manner upon his land, than would occur under natural conditions. This is the settled law of this state. [Citations.]' " (*Andrew Jergens Co. v. City of L.A.* (1951) 103 Cal.App.2d 232, 235 [229 P.2d 475], italics added; see also *Locklin, supra,* 7 Cal.4th at pp. 351–352.)

Within the park was a steep slope; the plaintiff, Wildensten, owned the property on top of the slope and immediately adjacent thereto. The slope was subject to landslides, thereby subjecting Wildensten's property to retrogressive failure. Wildensten contended that her property had been taken and damaged within the meaning of article I, section 19 of the California Constitution. The Court of Appeal stated: "The issue before us is whether a governmental entity's mere ownership of undeveloped land and refusal to stabilize part of the land which threatens an adjacent landowner's property with landslide supports a claim for inverse condemnation. We hold it does not. [¶] To state a cause of action for inverse condemnation, the plaintiff must allege the defendant substantially participated in the planning, approval, construction, or operation of a public project or improvement which proximately caused injury to plaintiff's property. [Citations.] [¶] Wildensten's first amended complaint makes the legal conclusion that the District's ownership of the land alone constitutes an 'improvement.' . . . [¶] . . . Wildensten offers no authority holding that a governmental entity's mere ownership of raw land which threatens adjoining private property with landslide amounts to 'substantial participation' in a public project or improvement. We have found no cases directly addressing the novel theory urged by Wildensten. To the contrary, relevant case law confirms that mere ownership of undeveloped land, without more, cannot form the basis for an inverse condemnation claim." (*Wildensten v. East Bay Regional Park Dist., supra,* at pp. 979–980, fn. omitted.) "Alleging no affirmative actions by the District to further a public project which proximately caused injury to her property, Wildensten thus failed to state a cause of action for inverse condemnation." (*Id.* at p. 982.)[5] Here, as in *Wildensten,* there is no evidence that the Greenwood alignment is anything other than unimproved raw property over which the County took no affirmative action.

---

[5] We recognize there is language in two cases which, by negative implication, could be read to support the assertion that ownership itself is sufficient to support a finding of a "public improvement." (See *Yox v. City of Whittier* (1986) 182 Cal.App.3d 347, 352–353 [227 Cal.Rptr. 311] [reference to the fact "that the street and pumps which constituted the drainage system were entirely privately built and maintained *and were never dedicated to or accepted by the public*" (italics added, fn. omitted)]; *Ullery v. County of Contra Costa* (1988) 202 Cal.App.3d 562, 568–569 [248 Cal.Rptr. 727] ["where 'there is no acceptance of a street or the drainage system within it, there is no public improvement, public work or public use and therefore there can be no public liability for inverse condemnation' "], quoting *Yox v. City of Whittier, supra,* at p. 354.) In our view, the denial of liability in both of these cases did not turn on the fact that the improvements were not dedicated to and accepted by the governmental entity, but rather on the fact that the entity did not exercise dominion and control over the improvements. In *Ullery,* the natural watercourse was entirely on private property over which the county exercised no dominion and control; in *Yox,* the subject improvements were built on private property and the only act by the city was to approve the subdivision map and issue the respective permits. Otherwise, the city did nothing as it relates to the particular property.

■ Even if mere ownership of unimproved property is sufficient to constitute a public improvement, it is still necessary to show that the governmental entity's conduct toward the property was deliberate. As stated in *Arreola v. County of Monterey, supra*, 99 Cal.App.4th at page 742: "A public entity's maintenance of a public improvement constitutes the constitutionally required public use so long as it is the entity's deliberate act to undertake the particular plan or manner of maintenance." In the present case, as in *Wildensten*, there was no evidence that the County deliberately undertook a particular plan of maintenance or course of action toward the unimproved Greenwood alignment. We therefore conclude that under our facts the Greenwood alignment was not a public improvement.

■ The parties do not dispute that the paved portion of Greenwood Avenue is a "public improvement." The paved portion was indisputably accepted into the County road system by 1970 and was improved by being paved. (See *Sheffet v. County of Los Angeles* (1970) 3 Cal.App.3d 720, 734 [84 Cal.Rptr. 11] [improvement of streets constitutes a public improvement for purposes of inverse condemnation]; cf. *Andrew Jergens Co. v. City of L.A., supra*, 103 Cal.App.2d at p. 236 [the defendant's paving of a roadway allegedly increased the downstream flow of water].) The primary issue, however, is whether the paved status of Greenwood Avenue was a substantial cause in bringing about plaintiffs' damages. We agree with the trial court that it was not.

Here, the trial court in its statement of decision found that the paved portion of Greenwood Avenue was not a substantial cause of plaintiffs' damages. In our review, we accept any reasonable interpretation of the evidence that supports the trial court's decision. We do not, however, defer to that decision entirely. (*DiMartino v. City of Orinda* (2000) 80 Cal.App.4th 329, 336 [95 Cal.Rptr.2d 16].) We look to the entire record to determine whether the decision is supported by substantial evidence. (*In re Marriage of Schmir* (2005) 134 Cal.App.4th 43, 49–50 [35 Cal.Rptr.3d 716]; *Locklin, supra*, 7 Cal.4th at p. 369.)

■ The issue of causation was addressed in *Belair, supra*, 47 Cal.3d 550. There, a levee failed to retain water within its designed capacity and gave way after several days of heavy storms. (*Id.* at p. 555.) In finding a causal relationship between the failure of the public improvement and the plaintiffs' damages, the court stated: "[I]n order to establish a causal connection between the public improvement and the plaintiff's damages, there must be a showing of ' "a substantial cause-and-effect relationship excluding the probability that other forces *alone* produced the injury." [Citations.]' [Citation.] Where independently generated forces not induced by the public flood control improvement—such as a rainstorm—contribute to the injury, proximate cause

is established where the public improvement constitutes a *substantial concurring cause* of the injury." (*Id.* at pp. 559–560.)

Here, there was no evidence that any property owners along the paved portion of Greenwood Avenue sustained any damage from water or debris flows prior to the December 2003 storm. As the trial court found, Dr. Pradel's testimony established that the *sole* cause of plaintiffs' damages was the breaking of the dam. Dr. Pradel testified that without the sediment and debris from the dam, most of the material would not have reached the houses along Greenwood Avenue. Our record is devoid of any facts supporting plaintiffs' position that the paved portion of Greenwood Avenue was a substantial concurring cause of plaintiffs' injuries in December 2003.[6] Accordingly, we find no error in the trial court's grant of nonsuit as it relates to the December 2003 flood.

C. *The Trial Court Did Not Err in Applying a Reasonableness Standard or in Finding That the County Acted Reasonably in Installing the K-rails Prior to the October 2004 Flood*

As to the October 2004 flood, the trial court found that the installation of the K-rails was a public improvement. It further found that causation was established and that plaintiffs suffered damages. However, contrary to plaintiffs' position, the trial court did not apply the strict liability standard of *Albers, supra*, 62 Cal.2d 250; instead, it applied the test of reasonableness set forth in *Belair, supra*, 47 Cal.3d 550 and *Locklin, supra*, 7 Cal.4th 327. We agree with the trial court.

Our standard of review is mixed. The question of whether to apply a standard of reasonableness (under *Belair* and *Locklin*) or a strict liability standard (under *Albers*) is a legal issue we review de novo. (See *Pacific Bell v. City of San Diego* (2000) 81 Cal.App.4th 596, 601 [96 Cal.Rptr.2d 897].) When the reasonableness standard applies, the question of whether a public agency acted reasonably is a fact-based inquiry. (*Belair, supra*, 47 Cal.3d at p. 566; *Skoumbas v. City of Orinda* (2008) 165 Cal.App.4th 783, 796 [81 Cal.Rptr.3d 242].) We review the court's factual findings under the substantial evidence standard. (Cf. *Akins v. State of California* (1998) 61 Cal.App.4th 1, 36 [71 Cal.Rptr.2d 314].) The application of the appropriate legal standard to the facts properly found by the trial court is a legal question. (See *Paterno v. State of California* (2003) 113 Cal.App.4th 998, 1023 [6 Cal.Rptr.3d 854]; *Ali v. City of Los Angeles* (1999) 77 Cal.App.4th 246, 250 [91 Cal.Rptr.2d 458].)

---

[6] Even if the Greenwood alignment was a public improvement, our conclusion as to causation would be the same.

Following the December 2003 flooding, the County installed K-rails at the mouth of the canyon and down both sides of the paved portion of Greenwood Avenue. The installation was deliberately designed and placed by the County in an attempt to contain surface water and debris within a fixed channel. As such, it was a public improvement. (See *Marin v. City of San Rafael* (1980) 111 Cal.App.3d 591, 595 [168 Cal.Rptr. 750] ["The construction and maintenance of storm drainage systems are matters of 'public policy,' and such a system created by a public entity becomes a 'public improvement' . . . ."], disapproved on another point in *Bunch v. Coachella Valley Water Dist.* (1997) 15 Cal.4th 432, 447–448 [63 Cal.Rptr.2d 89, 935 P.2d 796].)

Plaintiffs, relying on *Albers, supra*, 62 Cal.2d 250, argue that the County should be strictly liable for the damages proximately caused by the installation of the K-rails. In *Albers*, a major landslide in the Palos Verdes Hills damaged the plaintiffs' properties. (*Id.* at p. 254.) Prior thereto, the area was known by geologists and by the County of Los Angeles to be a slide area. In an effort to provide greater vehicular access to the area, the county acquired a road easement and began improvements. The landslide at issue was triggered as a result of pressure exerted by 175,000 cubic yards of dirt that had been placed on the road easement and adjacent thereto. A number of the plaintiffs lost their homes and damage was caused to the water distribution system of a local company. Finding an absence of negligence, the trial court ruled in favor of the county. (*Id.* at p. 255.) The Supreme Court reversed.

The *Albers* court, while recognizing certain exceptions established by *Archer v. City of Los Angeles* (1941) 19 Cal.2d 19 [119 P.2d 1] (*Archer*), overruled as stated in *Locklin, supra*, 7 Cal.4th at page 337, and *Gray v. Reclamation District No. 1500* (1917) 174 Cal. 622 [163 P. 1024], set forth a basic rule of strict liability. In interpreting the "takings clause" of the California Constitution, the court stated: " 'We are of the opinion that the right assured to the owner by this provision of the [C]onstitution is not restricted to the case where he is entitled to recover as for a tort at common law. If he is consequently damaged by the work done, whether it is done carefully and with skill or not, he is still entitled to compensation for such damage under this provision. This provision was intended to assure compensation to the owner, as well where the damage is directly inflicted, or inflicted by want of care and skill, as where the damages are consequential, and for which damages he had no right of recovery at the common law.' " (*Albers, supra*, 62 Cal.2d at p. 257.)

Thereafter, in *Holtz, supra,* 3 Cal.3d 296, a case involving subsidence of adjacent property as a result of excavation for the construction of the Bay Area Rapid Transit system, the court again applied the concept of strict liability. However, it further observed: "In announcing our holding in *Albers* . . . while of course most fundamentally influenced by [the] 'loss distribution' premise, we did not overlook the competing considerations which caution against an open-ended, 'absolute liability' rule of inverse condemnation. Recognizing that 'fears have been expressed that compensation, allowed too liberally, will seriously impede, if not stop, beneficial public improvements because of the greatly increased cost' [citation], we deemed it prudent to focus our policy inquiry on situations which shared a general factual similarity with that present in *Albers.*" (*Id.* at pp. 303–304, fn. omitted.)

■  The issue of strict, or absolute, liability was revisited in *Belair, supra,* 47 Cal.3d 550, a case dealing with damage caused by flood waters following a levee break. In distinguishing *Albers* and *Holtz,* the court discussed at length the *Archer* decision, which the *Albers* court recognized as one of the exceptions to the rule of absolute liability.[7] In explaining the *Albers* court's recognition of the *Archer* exception, the *Belair* court stated: "[W]e recognized in *Albers* that strict inverse condemnation liability may not be appropriate in the case of flood control improvements . . . ." (*Belair, supra,* at p. 564.) The court continued: "On the one hand, a public agency that undertakes to construct or operate a flood control project clearly must not be made the absolute insurer of those lands provided protection. On the other hand, the damage potential of a defective public flood control project is clearly enormous. Therefore, as we observed in *Holtz,* the courts have consistently held that 'even when a public agency is engaged in such "privileged activity" as the construction of barriers to protect against floodwaters, *it must [at least] act reasonably and non-negligently.* [Citations.]' [Citations.] Contrary to plaintiffs' position, the fact that a dam bursts or a levee fails is not sufficient, standing alone, to impose liability. However, where the public agency's design, construction or maintenance of a flood control project is shown to have posed an unreasonable risk of harm to the plaintiffs, and such unreasonable design, construction or maintenance constituted a substantial cause of the damages, plaintiffs may recover regardless of the fact that the project's purpose is to contain the 'common enemy' of floodwaters. [Citations.]" (*Id.* at p. 565.)

---

[7] In *Archer,* the city improved various creeks and channels which carried water into a lagoon. (*Archer, supra,* 19 Cal.2d at p. 22.) As a result of the improvements, more water was channeled more quickly into the lagoon. Lacking the capacity to handle the increased flow, the lagoon backed up, damaging the plaintiffs' properties. The plaintiffs were denied recovery based primarily on the principle of water law that an upstream owner owes no duty to a downstream owner. (*Id.* at pp. 25–29.)

The *Belair* standard was clarified by *Locklin*. There, the plaintiffs owned land that extended to the middle of a natural watercourse which drained a watershed of approximately 2,291 acres. (*Locklin, supra*, 7 Cal.4th at pp. 338–339.) As a result of upstream development, the watercourse began carrying larger volumes of water which, in turn, caused significant erosion of the plaintiffs' properties. The defendant governmental entities were aware of the problem and could have acted to prevent the erosion. (*Id.* at p. 339.) Each public entity was sued on the basis that their upstream improvements, including their storm drain system, as well as their failure to maintain the watercourse, increased the volume and velocity of the water in the natural watercourse, causing the plaintiffs' damages. (*Id.* at pp. 339–340.)

In reaffirming the test of reasonableness set forth in *Belair*, the *Locklin* court stated: "When alterations or improvements on upstream property discharge an increased volume of surface water into a natural watercourse, and the increased volume and/or velocity of the stream waters or the method of discharge into the watercourse causes downstream property damage, a public entity, as a property owner, may be liable for that damage. The test is whether, under all the circumstances, the upper landowner's conduct was reasonable. This rule of reasonableness applies to both private and public landowners . . . ." (*Locklin, supra*, 7 Cal.4th at p. 337.) With respect to flood control projects, the court stated: "[T]he public agency is liable only if its conduct posed an unreasonable risk of harm to the plaintiffs, and that unreasonable conduct is a substantial cause of the damage to plaintiff's property. The rule of strict liability generally followed in inverse condemnation (see *Albers, supra*, 62 Cal.2d 250, 263–264) is not applicable in this context." (*Id.* at p. 367.) The departure from a strict liability standard was based on public policy: "[B]ecause strict liability would discourage construction of needed public improvements which affect surface water drainage, liability exists only if the agency acts unreasonably, with reasonableness determined by balancing the public benefit and private damage in each case." (*Id.* at p. 368.)[8]

For the reasons stated in *Belair* and *Locklin* we apply the reasonabless standard as opposed to the strict liability standard set forth in *Albers*. First, the County installed the K-rails on Greenwood Avenue for the purpose of flood control—to protect the residents from damage that could be caused by further flooding. As *Belair* stated, "a public agency that undertakes to construct or operate a flood control project clearly must not be made the absolute insurer of those lands provided protection." (*Belair, supra*, 47 Cal.3d at p. 565.) Second, as set forth in *Locklin*, "strict liability would discourage

---

[8] Thereafter, in *Bunch v. Coachella Valley Water Dist., supra*, 15 Cal.4th 432, the court again applied *Belair*'s rule of reasonableness when a dike and levee were overtopped by a storm. (*Bunch v. Coachella Valley Water Dist., supra*, at p. 436.)

construction of needed public improvements which affect surface water drainage." (*Locklin, supra*, 7 Cal.4th at p. 368.) Here, the County installed the K-rails under exigent circumstances created by the combination of the Old Fire and the possibility of heavy rains in order to protect the residents of Greenwood Avenue. As set forth in the discussion regarding the 2003 flooding, if the County had taken no action to protect the residents there would be no basis for imposing liability on the County. If liability for acting—i.e., installing the K-rails—could be imposed on the County based on strict liability, the County could well have decided to take no action. As a matter of "public policy and common sense" (*Belair, supra*, at p. 565), *some* protective action (even if it should ultimately be insufficient) should not be discouraged. We thus hold that the reasonable standard established in *Belair* and clarified in *Locklin*, not the strict liability standard applied in *Albers*, is appropriate in this case.

In applying this standard of reasonableness, as explained in *Locklin*, the plaintiff, among other things, "must demonstrate that the efforts of the public entity to prevent downstream damage were not reasonable in light of the potential for damage posed by the entity's conduct, the cost to the public entity of reasonable measures to avoid downstream damage, and the availability of and the cost to the downstream owner of means of protecting that property from damage." (*Locklin, supra*, 7 Cal.4th at p. 369.) Considerations in determining the reasonableness of the conduct in light of the underlying constitutional right that a property owner contribute no more than his share to the public undertaking are: "(1) The overall public purpose being served by the improvement project; (2) the degree to which the plaintiff's loss is offset by reciprocal benefits; (3) the availability to the public entity of feasible alternatives with lower risks; (4) the severity of the plaintiff's damage in relation to risk-bearing capabilities; (5) the extent to which damage of the kind the plaintiff sustained is generally considered as a normal risk of land ownership; and (6) the degree to which similar damage is distributed at large over other beneficiaries of the project or is peculiar only to the plaintiff." (*Id.* at pp. 368–369.)

Applying these factors to the present matter, there is substantial evidence to support the trial court's conclusion that the installation of the K-rails was reasonable. In October 2003, the Old Fire significantly burned the mountains just north of Greenwood Avenue. Two months later, surface water inundated the neighborhood following a rain; as a result, plaintiffs' properties sustained substantial damage. While numerous studies performed by the County in the years before the December 2003 rain had shown that the infrastructure at the base of the mountains was inadequate, there was no evidence that any of plaintiffs' properties had sustained any damage in the preceding years as a

result of surface water.[9] Because the December rain occurred during the rainy season, the County was faced with an exigent situation that called for prompt action to protect plaintiffs' properties from further damage. Theodore Hromadka, the County's expert, indicated that at the time of the installation of the K-rails, the flood and storm season of January and February was just beginning. Kenneth Miller, a former director of public works for the County, testified that at the time of the December 2003 event, he considered it an emergency situation relative to protecting Greenwood Avenue from the threat of debris from future storms. Mr. Hromadka further testified that given the intensity of the fire, the County's budget, and the quick timeframe for dealing with the situation, the County's decision to install K-rails was eminently reasonable.

As a whole, the evidence demonstrated that the K-rails were installed for the public purpose of protecting the local neighborhood. The situation was exigent and there was no evidence presented that there were other feasible alternatives that would have provided better protection for plaintiffs' properties.[10] Additionally, given the flooding that occurred during the December 2003 rain, it is evident that similar damage would have occurred during the October 2004 storm if the County had not installed the K-rails. Lastly, there was uncontroverted testimony that the installation of the K-rails benefitted the adjacent properties. In the absence of the K-rails, the damage to plaintiffs' properties would have been greater than the damage that occurred.

Thus, in considering the factors set forth in *Locklin*, as applied to the present facts, there is substantial evidence supporting the trial court's decision that the County's conduct in installing the K-rails was reasonable.

Lastly, we reject plaintiffs' reliance on *Albers* and the principle of strict liability. In viewing the multitude of cases cited by plaintiffs, only five appear to either explicitly or implicitly apply the concept of strict liability to damages caused by surface water.[11] Four of the cases predate *Belair*, and the remaining case (*Akins v. State of California, supra*, 61 Cal.App.4th 1) is clearly distinguishable. As to the cases predating *Belair*, their continuing validity in this context has been placed in doubt. As the court in *Bunch v. Coachella Valley Water Dist., supra*, 15 Cal.4th 432, stated: "Without expressly disapproving those Court of Appeal decisions finding strict liability

---

[9] Studies were done by the County in 1975, 1976, 1977, and 1982.

[10] Testimony was presented that the County considered sandbags and straw bales, but opted in favor of the K-rails because they were more durable.

[11] *Frustuck v. City of Fairfax* (1963) 212 Cal.App.2d 345 [28 Cal.Rptr. 357], *Sheffet v. County of Los Angeles, supra*, 3 Cal.App.3d 720, *Blau v. City of Los Angeles* (1973) 32 Cal.App.3d 77 [107 Cal.Rptr. 727], *Souza v. Silver Development Co.* (1985) 164 Cal.App.3d 165 [210 Cal.Rptr. 146], and *Akins v. State of California, supra*, 61 Cal.App.4th 1.

for diverted surface waters, *Belair* observed in dictum that its 'reasonableness' analysis would most likely apply to future diversion cases when the government sought to prevent flooding on land potentially subject to it. The court doubted whether unintended property damage caused by diversion of water 'would elevate the test of inverse condemnation liability to absolute liability, rather than a reasonableness standard.' (*Belair, supra*, 47 Cal.3d at p. 567.)" (*Id.* at p. 444.) In light of *Belair* and *Bunch*, we decline to follow such cases.

■ *Akins*, which postdates *Belair*, is readily distinguishable. There, in order to protect lower lying properties, the State of California created a dam that caused flooding of the plaintiffs' upper lying land, which had not been subject to flooding prior to the improvements. (*Akins v. State of California, supra*, 61 Cal.App.4th at pp. 7–8.) In applying the rationale of *Albers*, the court stated: "We shall conclude the reasonableness test does not apply if governmental flood control works cause flooding by intentionally diverting water to upstream private property which was not historically subject to flooding, in order to protect lower lying land." (*Id.* at p. 8.) The court explained that "[u]sing private property not historically subject to flooding as a retention basin to provide flood protection to other property exacts from those owners whose properties are flooded a contribution in excess of their proper share to the public undertaking." (*Id.* at p. 29.) The court expressly distinguished the facts in the case before it from the situation faced in *Belair* and *Bunch*, stating: "We thus conclude an intentional diversion of water which floods private property not historically subject to flooding subjects flood control agencies to inverse condemnation liability without proof of unreasonable conduct. . . . We see a difference between the type of situation present in cases such as *Belair* and [*Bunch*] and the instant case. On the one hand is the type of situation where a public entity tries to protect private property owners from a risk created by nature and in doing so may alter the risks created by nature, but the public entity's efforts fail. On the other hand is a situation where government appropriates private property in order to protect other property, creating a risk which would not otherwise exist. We see no unfairness in applying a reasonableness standard to the first situation but not to the second." (*Akins v. State of California, supra*, at p. 33.)

■ Here, in installing the K-rails, the County was attempting to protect private property owners from a risk created by nature. The evidence is clear that the County's conduct did not create a situation or a risk that would not otherwise have been present had it not installed the K-rails. As the December 2003 storm indicated, plaintiffs' properties would have flooded again if the K-rails had not been installed. The public improvement did not expose plaintiffs' properties to a risk of flooding that did not otherwise exist.

## III. DISPOSITION

We affirm the trial court's judgment in all respects. The County is awarded its costs on appeal.

McKinster, Acting P. J., and Codrington, J., concurred.

Appellants' petition for review by the Supreme Court was denied November 16, 2011, S196917.