Filed 5/16/16  Ronald W. Komers Trust v. County of Riverside CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

|  |  |
|---|---|
| RONALD W. KOMERS TRUST, | |
| Plaintiff and Appellant, | E063550 |
| v. | (Super.Ct.No. RIC1314390) |
| COUNTY OF RIVERSIDE, | OPINION |
| Defendant and Respondent. | |

APPEAL from the Superior Court of Riverside County.  John W. Vineyard, Judge.  Affirmed.

Hubbard Law Firm, David F. Hubbard and Mordecai Eli Underwood for Plaintiff and Appellant.

Lewis Brisbois Bisgaard & Smith, Arthur K. Cunningham; Arias & Lockwood and Christopher D. Lockwood for Defendant and Respondent.

Plaintiff and appellant Ronald W. Komers Trust (Komers) appeals the grant of defendant and respondent County of Riverside's (County) motion for determination of

1

liability filed pursuant to Code of Civil Procedure section 1260.040 (Motion).[1]  Komers's property was damaged as a result of a County employee conducting weed abatement next to a County road.  The employee used a mower attached to a County-owned tractor.  The mower hit a barbed wire fence and started a fire, dubbed the Volcano Fire, which spread to Komers's property.  Komers filed a complaint for inverse condemnation.

The trial court granted County's Motion, that it had no liability in inverse condemnation.  Komers contends on appeal that the trial court erred by granting the motion because the weed abatement conducted by County was an inherently risky and defective maintenance plan, which gave rise to liability for inverse condemnation.  We find that the Motion was properly granted as Komers failed to meet its burden of proving a claim in inverse condemnation.

## FACTUAL AND PROCEDURAL HISTORY

A.     <u>KOMERS'S COMPLAINT FOR INVERSE CONDEMNATION</u>

On December 26, 2013, Komers filed its complaint in inverse condemnation based on damages to its property caused by the Volcano Fire.  Komers alleged as to liability as follows:  "In early August 2012, the County was engaged in a public project commonly identified as weed abatement on a 9,000-acre County Park called the Santa Rosa Plateau Ecological Reserve in the unincorporated area of Murrieta (hereafter, 'project') when a fire resulted as a direct consequence of the County's actions in furtherance of the project.  The fire was identified by the California Department of Forestry and Fire Protection,

---

[1] All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

2

among others, as 'the Volcano Fire' and will be hereafter as well. The Volcano Fire ultimately burned through approximately 400 acres." Komers sought reimbursement for damages not covered by insurance, including the loss of approximately 500 mature trees; costs incurred in having to remove dead trees; loss of vacation rental income because of the unsightly condition of the property; damage from fire retardant; and loss of income from the destruction of mature avocado trees and grapevines. County filed an answer to the complaint generally denying every allegation in the complaint.

B. COUNTY'S MOTION FOR DETERMINATION OF LIABILITY

On January 15, 2015, County filed the Motion. County presented the following facts: Komers owned property located at the corner of 21100 Via Los Laureles and 21121 Via Los Laureles in Murrieta. County conducted weed abatement on a nearby 9,000-acre park called the Santa Rosa Plateau Ecological Reserve. On August 1, 2012, a fire started in the area of Tenaja Road and Via Volcano when a County employee was mowing weeds at the side of a County road as routine maintenance and ran over barbed wire hidden in the weeds. The mower blades hit the wire and sparked the fire. The fire was dubbed the Volcano Fire and spread to Komers's Murrieta property. Komers presented tort claims to the County; the claims were rejected by operation of law. Komers did not commence the Complaint within six months of the denial of the tort claims.

County stated that inverse condemnation involves the taking or damaging of private property for public use without just compensation. County contended there was no authority for the proposition that ordinary negligence in maintenance of a County road

3

creates liability under inverse condemnation. County argued that a motion pursuant to section 1260.040, to resolve liability in an inverse condemnation action, was appropriate and that the trial court could decide issues of fact without a trial.

County argued California law was clear and unambiguous that eminent domain and inverse condemnation law did not subject County to general tort liability. Further, negligent acts committed during day-to-day operations of the public improvement do not give rise to inverse condemnation. County cited to *Paterno v. State of California* (1999) 74 Cal.App.4th 68 at pages 86 through 87 (*Paterno*) for the proposition that when damage to private property results from acts of employees rather than a policy decision, there is no taking for inverse condemnation purposes. There must be proof that the plan of maintenance must be unreasonable to establish the taking. County claimed, "The fact that plaintiff could have, but did not, file a timely lawsuit for tort damages against County does not entitle plaintiff to recover under Inverse Condemnation." Inverse condemnation did not impose a constitutional based liability for damage incidentally caused by the actions of public employees in their public duties.

County concluded cutting weeds and removing brush from roadsides is routine maintenance and had nothing to do with the function of public improvement. The only possible liability on behalf of County would have been a tort claim, and Komers chose not to file a tort claim.

County submitted two declarations in support of the Motion. Cecilia Gil was the Board Assistant to the Clerk of the Riverside County Board of Supervisors. Included in her duties was the receipt of tort claims against County. Komers submitted two tort

4

claims to County on January 16, 2013, for damage to its property. On March 4, 2013, the claims were rejected "by operation of law" and Komers was advised that a court action had to be filed within six months from the rejection of the claims. The tort claims filed by Komers for damages were also attached to the Motion. The claims alleged that a County weed abatement employee caused a 400-acre fire that damaged Komers's property.

The second declaration was from Chris Palmer. He was employed by the California Department of Forestry and Fire Protection. He was the incident investigator for the Volcano Fire that occurred on August 1, 2012. The fire ultimately burned approximately 350 acres. The cause of the fire was determined to be "blade strikes on barbed wire from a Riverside County Transportation Department reach mower conducting brush removal." The California Department of Forestry and Fire Protection investigation report was attached, which confirmed the cause of the fire.

C.     KOMERS'S OPPOSITION TO COUNTY'S MOTION

On February 6, 2015, Komers filed opposition to the Motion. Komers contended that County only relied on cases involving water damage, and not fire damage. Komers contended that fire damage involved a different legal standard.

Komers provided the additional facts that County employee, Michael Rios, was using a tractor to perform weed abatement. The tractor had a dry chemical fire extinguisher on it. Rios attempted to use the fire extinguisher to put out the fire but it did not work. Komers lost hundreds of avocado trees, hundreds of grapevines, rental income, and damage to personal property. The California Department of Forestry and Fire

5

Protection determined that County was the cause of the fire. Komers also contended that a County internal report concluded that Rios was performing normal mowing operations and did nothing out of the ordinary when he caused the fire.

Komers contended that strict liability applied to inverse condemnation actions. Komers relied on several cases imposing liability "when a public project creates a fire that damages private property." Komers cited to *Marshall v. Department of Water and Power* (1990) 219 Cal.App.3d 1124 (*Marshall*). That case involved a fire caused by downed power lines. Komers quoted language in *Marshall* that "'[a] governmental entity may be held strictly liable, irrespective of fault, where a public improvement constitutes a substantial cause of the plaintiff's damages even if only one of several concurrent causes.'" Komers also relied upon *Pacific Bell Telephone Co. v. Southern California Edison Co.* (2102) 208 Cal.App.4th 1400 at page 1410 (*Pacific Bell*).

Komers criticized County for relying on the negligence of its employee in supporting that County was not liable under a theory of inverse condemnation. Komers alleged that County had internally determined that Rios was performing normal mowing operations and did nothing out of the ordinary. Komers argued that a public entity is liable for inverse condemnation unless the employee acts outside the pubic entity's plan of operation. County could only escape liability if the employee deviated from the public entity's plan.

Komers contended that Rios was performing his job, which County asked him to perform, in the manner in which he was told to perform it. County provided Rios with

6

the tools to perform the weed abatement.  County was strictly liable for the damages caused to Komers's property.

Komers further argued County had failed to establish that their employee was negligent.  Further, County was aware the potential for fire existed as "demonstrated by the presence of the fire extinguisher on County-provided tractor."

Finally, Komers contended the fundamental public policy behind the principle of eminent domain and inverse condemnation was that an individual should not be forced to bear a burden that should be borne by the community at large.  Komers contended that County undertook weed abatement with the knowledge of the risk of fire and that private property may be damaged.  It should be held liable for such a plan.

Komers attached a report prepared by County regarding the Volcano Fire.  It included the following conclusion by a district road maintenance supervisor employed by County:  "[I]t was deemed that Mike Rios was performing normal mowing operations and did nothing out of the ordinary in this operation.  Mike performed a visual before starting the mowing operation.  Mike could not see any type of obstruction or debris due to the height of the weeds and brush.  Because barb wire was nestled in the weeds and could not be noticed, the barb wire tangled in the mower head during mowing operation causing friction and heat which ignited the weeds.  Mike did what he could to contain and extinguish the fire.  Mike kept himself out of harm's way and called 911 when he was able to receive reception.  This was a complex situation that resulted in unfortunate results."  A narrative was also part of the incident report.  It provided that Rios hit the barbed wire that was hidden by weeds.  It did not immediately start a fire.  He started to

7

drive away but looked back to see smoke. Rios immediately turned around and used a 10-pound dry chemical fire extinguisher that he had on the tractor to try to put out the fire but it did not work. Rios also had a 5-pound fire extinguisher on the tractor. The report included the conclusion, "It is my opinion that Mike Rios did everything he could to prevent the fire and to extinguish the fire. This I believe is a non-preventable accident."

Komers attached additional pages of the California Department of Forestry and Fire Protection report prepared by Palmer, which had been submitted with the Motion. Palmer spoke with Rios. Palmer found barbed wire in the mower attachment on the tractor. It matched the wire on a fence that was damaged. The tractor that had the mower attachment was a turbo-charged diesel motor. Palmer concluded, based on his training and experience, that the fire started by the barbed wire coming in contact with the mower attachment. The barbed wire sparked the fire. Palmer also indicated that the dry chemical extinguisher was not the right type of extinguisher for the fire. Palmer concluded, "The tractor should have been equipped with a water type extinguisher and hand tools for fire suppression."

D.     COUNTY'S REPLY TO KOMERS'S OPPOSITION TO THE MOTION

County filed its reply to the opposition. County argued that the standard of review—strict liability or reasonableness—did not matter as the weed abatement was routine maintenance and not a public use project. County argued inverse condemnation was not intended to cover whenever a government employee committed an act that caused loss of private property. County also distinguished cases in which a downed power line caused a fire. County argued that the power lines were clearly a public use

8

project.  Weed abatement was not akin to utility power lines.  County argued, "Public utilities, such as supplying power and electricity, are clearly a public project, while routine weed abatement on public property is clearly simple maintenance."

E.     RULING

Komers attached the tentative ruling of the trial court to appellant's opening brief. The Court stated:  "Pursuant to *Bauer vs. County of Ventura* (1955) 45 Cal.2d 276, 286, damage resulting from negligence in the routine operation having no relation to the function of the project does not give rise to liability for inverse condemnation.  Where damage results from the acts of employees, and not from a policy decision, there is no taking:  recovery, if any, lies in a tort action such as negligence (*Paterno*[, *supra*,] 74 Cal.App.4th [at p.] 87).  [¶]  In this case, Plaintiff's damages resulted from a County employee running the tractor mower over barbed wire while performing maintenance duties.  Weed abatement is distinguishable from the public use project cases that Plaintiff relies on (*Pacific Bell Telephone*, *Marshall*, etc.).  Weed abatement is part of the day-to-day maintenance and operation of the public improvement (the County road).  Consistent with *Bauer* and *Paterno*, the Court finds that the County is not liable under an inverse condemnation theory."

The judgment granting the Motion was signed on March 17, 2015.  The notice of entry of judgment was entered on March 27, 2015.

**DISCUSSION**

Komers's theory of liability for inverse condemnation was based on its claim that Rios was not negligent in mowing County road, but rather, followed County's plan for

9

weed abatement. Komers concludes on appeal that because the plan of weed abatement adopted by County involved using a diesel tractor in the middle of fire season, it was inherently risky, and County was strictly liable for any property damage incurred due to its defective maintenance plan.

Section 1260.040 provides in pertinent part: "(a) If there is a dispute between plaintiff and defendant over an evidentiary or other legal issue affecting the determination of compensation, either party may move the court for a ruling on the issue. The motion shall be made not later than 60 days before commencement of trial on the issue of compensation. The motion shall be heard by the judge assigned for trial of the case. [¶] . . . [¶] (c) This section supplements, and does not replace any other pretrial or trial procedure otherwise available to resolve an evidentiary or other legal issue affecting the determination of compensation." This provision applies to actions commenced on or after January 1, 2002. Section 1260.040 authorizes the government entity to move for a ruling on liability in an eminent domain or inverse condemnation action because it is a legal issue affecting the determination of compensation. (*Dina v. People ex. rel. Department of Transportation* (2007) 151 Cal.App.4th 1029, 1043-1047 (*Dina*).)

Review of a motion filed under section 1260.040 is "the equivalent of ruling on a motion for nonsuit." (*Dina*, *supra*, 151 Cal.App.4th at p. 1047.) As such, "'We "'must accept all facts asserted in the opening statement [or here, asserted in the best case scenario] as true and must indulge every legitimate inference which may be drawn from those facts. [Citations.] . . . [A nonsuit] can only be upheld on appeal if, after accepting all the asserted facts as true and indulging every legitimate inference in favor of plaintiff,

10

it can be said those facts and inferences lead inexorably to the conclusion plaintiff cannot establish an essential element of its cause of action.'"'" (*Id.* at p. 1047.)

"An inverse condemnation cause of action derives from article I, section 19 of the California Constitution, which states in relevant part:  'Private property may be taken or damaged for public use only when just compensation . . . has first been paid to, or into court for, the owner.'" (*Dina*, *supra*, 151 Cal.App.4th at p. 1048.)  "An action for inverse condemnation 'is an eminent domain proceeding initiated by the property owner rather than the condemner.  The principles which affect the parties' rights in an inverse condemnation suit are the same as those in an eminent domain action.'" (*Marshall*, *supra*, 219 Cal.App.3d at p. 1139.)  "'The law of inverse condemnation is not governed by the Eminent Domain Law, but has been '"left for determination by judicial development."'" (*Mt. San Jacinto Community College District v. Superior Court* (2004) 117 Cal.App.4th 98, 104.)

"Property is 'taken or damaged' within the meaning of article I, section 19 of the California Constitution, so as to give rise to a claim for inverse condemnation, when: (1) the property has been physically invaded in a tangible manner; (2) no physical invasion has occurred, but the property has been physically damaged; or (3) an intangible intrusion onto the property has occurred which has caused no damage to the property but places a burden on the property that is direct, substantial, and peculiar to the property itself." (*Oliver v. AT&T Wireless Services* (1999) 76 Cal.App.4th 521, 530.)

"To be subject to liability in inverse condemnation, the governmental action at issue must relate to the 'public use' element of article I, section 19.  'Public use' is the

11

threshold requirement.  [Citation.]  'The destruction or damaging of property is sufficiently connected with "public use" as required by the Constitution, if the injury is a result of dangers inherent in the construction of the public improvement as distinguished from dangers arising from the negligent operation of the improvement.'  [Citation.]  A public entity's maintenance of a public improvement constitutes the constitutionally required public use so long as it is the entity's deliberate act to undertake the particular plan or manner of maintenance."  (*Arreola v. County of Monterey* (2002) 99 Cal.App.4th 722, 742 (*Arreola*).)  "Unlike negligence, however, inverse condemnation does not require any breach of a standard of care, nor foreseeability of the harm.  Thus *any* actual physical injury to real property proximately caused by a public improvement as deliberately designed and constructed is compensable under article I, section 19 of the California Constitution whether or not the injury was foreseeable."  (*Aetna Life & Casualty Co. v. City of Los Angeles* (1985) 170 Cal.App.3d 865, 873.)

All that is required is a deliberate act by a public entity, which has as its object the direct or indirect accomplishment of the purpose for which the improvement was constructed and which causes a taking or damaging of private property.  (*Bauer*, *supra*, 45 Cal.2d at p. 285.)  The property owner has the burden of establishing that the public entity has, in fact, taken or damaged his or her property.  (*San Diego Gas Electric Co. v. Superior Court* (1996) 13 Cal.4th 893, 940.)

Here, the trial court relied on *Bauer*, *supra*, 45 Cal.2d 276, and *Paterno*, *supra*, 74 Cal.App.4th 68.  "In *Bauer*, a drainage ditch ran along the downhill border of the plaintiffs' property.  As originally constructed, any overflow from the ditch would have

12

run downhill and away from the plaintiffs' property. As time went on, the downhill side of the ditch was built up higher and higher with dirt and debris so that when the ditch later overflowed, it flooded the plaintiffs' land. The county argued that the change in the ditch was a result of its maintenance and negligent maintenance was not the 'public use' to which inverse condemnation liability would attach." (*Arreola*, *supra*, 99 Cal.App.4th at pp. 742-743.) The Supreme Court disagreed, explaining: "'The rather obscure line between the concepts of "construction" and "maintenance" is disclosed by any attempt to define them in mutually exclusive terms and to characterize the raising of a bank of an existing ditch as one or the other. If the "maintenance" consists of an alteration of the ditch by raising one of the banks, then in a material sense "maintenance" becomes a species of "construction." Had the bank been raised during the original construction it would have been part of the over-all project and hence within the rule. . . . The defendants' argument that damage from maintenance is beyond the purview of [article I,] section [19] invites an artificial distinction which would turn simply upon the passage of time between the original construction and the subsequent alteration and must therefore be rejected.'" (*Id*. at p. 743.) *Bauer* made it clear that "the taking or damaging of private property for the maintenance of an existing public improvement involving a deliberate act which has as it object the direct or indirect accomplishment of the purpose of the improvement as a whole constitutes a taking or damaging of property for a public use and the owner of such property is entitled to compensation." (*Bauer*, at p. 285.)

*Paterno*, *supra*, 74 Cal.App.4th 68 was an appeal from a judgment for the plaintiff on an inverse condemnation claim arising from a broken levee. The *Paterno* court stated

13

as to the claim by the plaintiff, "In the case of alleged shoddy maintenance, as here, it is the *plan* of maintenance which must be unreasonable to establish a taking. Poor *execution* of a maintenance plan does not result in a taking." (*Id.* at p. 87.) The *Paterno* court held that the trial court's statement of decision was deficient because it based liability "almost entirely on the violation of standards for levee maintenance, in other words, *departures from the lawful plan*, rather than on an unreasonable plan." (*Id.* at p. 90.)

This case is similar to *Tilton v. Reclamation District No. 800* (2006) 142 Cal.App.4th 848. There, another case involving the failure of a levee, the plaintiff in the complaint alleged that the defendant was responsible for the maintenance of the levee, the failure of the levee was due to the defendant maintaining the levee in a manner such that it was too steep for underwater conditions, and defendants substantially participated in the maintenance of the levee upon which plaintiff's property was located and such participation was for the use and/or benefit of the public. (*Id.* at p. 859.) The court concluded after reviewing several cases that, "although there may be liability in inverse condemnation where levee failures are integrally connected with a flawed plan for those levees and/or flawed construction, there is no such liability where similar failures are the result of negligent or inadequate operation and maintenance." (*Id.* at p. 858, fn. omitted.) The *Tilton* court criticized the plaintiff for never alleging that the maintenance plan was defective. As such, the court concluded, "[t]hese allegations do not meet the test we derive from the precedents just discussed, i.e., that garden variety inadequate maintenance, as distinguished from a faulty plan involving the design, construction and

maintenance of a levee, is not an adequate basis for an inverse condemnation claim." (*Id.* at p. 859.)

Here, what was missing from the Complaint and opposition by Komers, was evidence of "deliberateness," or in other words, a faulty plan of maintenance for weed abatement. Komers only made conclusory allegations in the Complaint and in its opposition that the plan to mow the weeds with the tractor was "inherently risky." However, Komers never alleged what County's plan for weed abatement consisted of, or how such a plan was defective. There was nothing presented that this type of weed abatement was not to be performed during fire season, or that County was aware that such plan was improper but proceeded with the plan regardless of the risk. Moreover, the California Department of Forestry and Fire Protection report stated nothing about the defectiveness of County's plan for weed abatement.

Moreover, absolutely no evidence was presented as to why the two fire extinguishers were on the tractor. In fact, the evidence established they were not the right type to extinguish a fire like the one that occurred in this case. Komers provided nothing to the trial court that could establish the plan of weed abatement—which was clearly maintenance—was somehow defective as required in order to find liability under inverse condemnation. If County decided not to engage in weed abatement at all, would not the risk of fire danger increase? Moreover, this court would merely engage in speculation as to what other method of weed abatement should have been used. Simply put, there was no proper allegation or evidence supporting that the weed abatement plan devised by County was defective. As such, there was no inverse condemnation claim.

15

This case differs from *Pacific Bell v. City of San Diego* (2000) 81 Cal.App.4th 596. In that case, a facility owned by the plaintiff sustained substantial damage when a corroded cast-iron water pipe servicing a fire hydrant burst; the pipe was owned by the defendant. The appellate court found that the defendant was aware prior to the pipe bursting that all of its cast-iron pipes needed to be replaced, but had no program or method for identifying those in need of immediate replacement. (*Id.* at pp. 599-600.) The *Pacific Bell* court found that the deliberateness required for inverse condemnation liability was satisfied by a finding that the public improvement, as designed, constructed and maintained, presented an inherent risk of danger to private property and the inherent risk materialized and caused damage. (*Id.* at p. 607.) The court found that the defendant chose to install the water pipes but provided no method of maintenance. The defendant could have incurred the cost in advance by monitoring and replacing the system before a failure caused damage. When it chose not to do so, article I, section 19 required that the cost be absorbed by the taxpayers as a whole, and not by the individual landowner. (*Id.* at pp. 607-608.) Here, there was no showing, as in *Pacific Bell*, of a defective plan.

The cases involving inverse condemnation liability due to downed power lines starting a fire are easily distinguishable. Here, the public improvement was parkland. The cause of the fire was maintenance on the land, not the park itself. In *Marshall*, *supra*, 219 Cal.App.3d 1124, the Los Angeles City Department of Water and Power had constructed a series of power polls to provide electricity to customers in Los Angeles. The trial court concluded the power polls were a "public improvement." (*Id.* at p. 1130.) On a "windy, very dry and hot" day, the power lines fell and sparked a fire. (*Id.* at p.

16

1131.)  The trial court concluded the cause of the fire was determined to be the downed power lines.  (*Id.* at p. 1133.)  The appellate court concluded substantial evidence supported the trial court's determination.  (*Id.* at p. 1141.)  The evidence clearly established that the power lines, a public improvement, deliberately caused the fire, unlike this case, which involved maintenance on the property.

*Aetna Life & Casualty Co. v. City of Los Angeles*, *supra*, 170 Cal.App.3d 865, also involved a fire that was started by downed power lines.  (*Id.* at p. 872.)  The court held, "[A]*ny* actual physical injury to real property proximately caused by a public improvement as deliberately designed and constructed is compensable under article I, section 19 of the California Constitution whether or not the injury was foreseeable. [Citation.]  It is not necessary that government's liability be based on negligence as long as there is a causal relationship between government's act or omission and the loss. [Citation.]  All that is required is a deliberate act by a public entity which has as its object the direct or indirect accomplishment of the purpose for which the improvement was constructed and which causes a taking or damaging of private property." (*Id.* at pp. 873-874.)  The court concluded that the deliberate design of the power lines caused the fire. (*Id.* at p. 874.)  Here, there was no showing that a public improvement directly caused the fire but rather liability was based on a defective maintenance plan.

The recent case of *Gutierrez v. County of San Bernardino* (2011) 198 Cal.App.4th 831 is also instructive.  In that case, the county installed K-rails to help with flood control but the plaintiff's property was damaged by a flood.  The court found that the installation of the K-rails was a public improvement.  It further found that causation was established

17

and the plaintiffs suffered damage. (*Id.* at p. 844.) The plaintiffs argued that the county should be held strictly liable for the damages caused by the installation of the K-rails. (*Id.* at p. 845.) The appellate court disagreed. It found that the proper standard for imposing liability was reasonableness. It concluded strict liability would discourage construction of needed public improvements if the county was held liable just for installing the K-rails. If the county was strictly liable, it would not seek to make such improvements. (*Id.* at pp. 847-848.) "As a matter of 'public policy and common sense' [citation], *some* protective action (even if it should ultimately be insufficient) should not be discouraged." (*Id.* at p. 848.)

The *Gutierrez* court then set forth the test for reasonableness. It found, "Considerations in determining the reasonableness of the conduct in light of the underlying constitutional right that a property owner contribute no more than his share to the public undertaking are: '(1) The overall public purpose being served by the improvement project; (2) the degree to which the plaintiff's loss is offset by reciprocal benefits; (3) the availability to the public entity of feasible alternatives with lower risks; (4) the severity of the plaintiff's damage in relation to risk-bearing capabilities; (5) the extent to which damage of the kind the plaintiff sustained is generally considered as a normal risk of land ownership; and (6) the degree to which similar damage is distributed at large over other beneficiaries of the project or is peculiar only to the plaintiff.'" (*Gutierrez*, *supra*, 198 Cal.App.4th at p. 848.)

Again, what is missing from this case is an "unreasonable plan of maintenance." (*Arreola*, *supra*, 99 Cal.App.4th at p. 747.) County could have chosen not to

18

conduct weed abatement, which certainly would increase the risk of fire. Since Komers failed to demonstrate, other than by conclusory allegations, that the weed abatement maintenance plan was unreasonable, "the trial court properly dismissed their cause of action for inverse condemnation." (*Dina*, *supra*, 151 Cal.App.4th at pp. 1051-1052.)

## DISPOSITION

The judgment of the trial court is affirmed. Respondent is awarded its costs on appeal.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER
J.

We concur:

RAMIREZ
P. J.

CODRINGTON
J.