Filed 4/30/14

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

| | |
|---|---|
| PHILIP L. BIRON, as Trustee, etc., et al., | C071094 |
| Plaintiffs and Appellants, | (Super. Ct. No. 167508) |
| v. | |
| CITY OF REDDING, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Shasta County, Monica Marlow, Judge.  Affirmed.

McNeill Law Offices and Walter P. McNeill for Plaintiffs and Appellants.

Damien M. Schiff and Anthony L. François for Pacific Legal Foundation as Amici Curiae on behalf of Plaintiffs and Appellants.

Richard A. Duvernay and Lynette M. Frediani, City Attorneys for Defendant and Respondent.

Plaintiffs Biron Family Living Trust and Philip L. and Julie M. Biron as trustees own a 12-unit apartment building in downtown Redding, California, which they purchased in 2001.  In February and March 2009, their property was damaged by flooding during two separate storm events.  They filed this action against defendant City

1

of Redding (City), alleging inverse condemnation and dangerous condition of public property.

The matter was bifurcated, and tried to the court without a jury as to liability. Following the plaintiffs' presentation of evidence, City moved for judgment pursuant to Code of Civil Procedure section 631.8, subdivision (b), and the trial court granted the motion only as to the allegations of flooding occurring in March 2009. The trial proceeded as to the allegations of flooding occurring in February 2009.

The trial court ruled in favor of City on both causes of action. As to the inverse condemnation claim, it applied the rule of reasonableness to conclude that City's decision to defer upgrades to City's storm drainage system did not pose an unreasonable risk of harm to plaintiffs. As to the cause of action for dangerous condition of public property, the court concluded City's decision to defer upgrades to the storm drainage system did not create a substantial risk of injury to members of the general public, and that even if the storm drain system had been a dangerous condition, City's conduct was reasonable.

Plaintiffs argue the trial court erred in applying a rule of reasonableness to the inverse condemnation cause of action, and claim City should have been strictly liable for the damage. Plaintiffs make no focused argument with respect to the dangerous condition of public property claim, other than to reiterate that City knew the storm drainage facilities were deficient, and that the facilities were a dangerous condition of public property.

We shall affirm the judgment.

The trial court was correct in determining that City's inverse condemnation liability was determined by a rule of reasonableness. Moreover, the trial court's findings of fact lead to the conclusion that the storm drain facilities were not a substantial cause of plaintiffs' damage. The trial court's finding that City acted reasonably, reasonableness being a complete defense to the dangerous condition of public property claim, is supported by substantial evidence.

FACTUAL AND PROCEDURAL BACKGROUND

The trial court filed a lengthy and detailed statement of decision. Plaintiffs make no claim that the evidence was insufficient to support the trial court's findings of fact. Therefore we derive most of the factual background in this opinion from the trial court's findings of fact contained within the statement of decision.

The Biron property is a 12-unit apartment building located at 2487 Court Street in downtown Redding. It is not directly adjacent to a natural watercourse, but there is a natural watercourse approximately a block away. The owner of the property adjacent to plaintiffs' installed a brick wall and floodgates because storm water had flooded that property in the past. The adjacent floodgates were in place when plaintiffs purchased their property in 2001.

City designed, constructed, and maintained a storm drainage system on and around plaintiffs' property as a means of surface water and flood control.[1] The facilities are intended in part to protect property, including plaintiffs' property. The Biron property is not within a mapped flood plain. There is a 36-inch storm drain inlet in the center of the parking lot on the Biron property. It falls outside City's easement for the purpose of storm drain maintenance, thus is privately owned and controlled by plaintiffs, who have the responsibility for its maintenance.

In 1993 Montgomery Watson Engineers contracted with City to prepare a city-wide master storm drain study (Study), which evaluated the city's storm drain facilities and made recommendations for repair and replacement. The purpose of the Study was to recommend upgrades and an implementation plan which would allow safe conveyance

---

[1] Plaintiffs object to City's characterization of the storm drain system as a flood control project because City's attorney admitted the system was "not a flood control project, per se." Of course, the statement of an attorney is not evidence. Plaintiffs do not point to any evidence that the purpose of the storm drain system was not to collect surface water and prevent flooding, whether or not it was "per se" a flood control project.

for floodflows from specific storm magnitudes (i.e., 10-year storms, 25-year storms, 100-year storms).

The Study contained a capital improvement plan, which set forth facilities needing improvement to convey future development design flows. The deficient facilities were ranked in order of priority, with the highest priority given to those facilities that were the most deficient, and the lowest priority given to those facilities that were the least severely undersized. Most of the downtown Redding facilities, where plaintiffs' property is located, were assigned the lowest priority because "the majority of the problems in that area consist[ed] of nuisance flooding [less than 2 feet deep, with low velocities] in the streets." Five facilities in the immediate vicinity of plaintiffs' property were included in the capital improvement plan. The recommended level of protection for all but one of the five facilities was a 25-year storm design. A 100-year storm design was recommended for the remaining facility. All five were assigned a priority of six, which was the lowest priority assigned in the capital improvement plan. None of the downtown facilities identified by the Study as deficient were ever improved. There was no evidence that the volume of runoff into the storm drain system increased as a result of development since the 1993 Study.[2]

City considered the storm drain utility to be grossly underfunded and lacking in available funds for improvement. The Study estimated the cost of recommended improvements to the facilities in the downtown area (where the Biron property is located) to be approximately $7.5 million. The cost of the recommended improvements for all

---

[2] Plaintiffs' reply brief argues there was evidence of properties that were built without drainage mitigation. However, defendant's witness testified the amount of rainfall that was diverted from the watershed exceeded the amount of impervious surface that may have been created by unmitigated development.

other facilities identified in the Study throughout the city was approximately $14.5 million.

In 1992 or 1993 there was a flood on the Biron property and on the adjacent Cresswell property. Afterward, a brick wall and floodgates were installed on the adjacent Cresswell property. In the flood of 1992 or 1993, two to three inches of flooding occurred inside the apartment complex that was later purchased by the Birons. The Birons were not aware of the 1992 or 1993 flood.

Storms resulting in flooding occurred on February 23 and March 16, 2009. A tenant of the Birons' apartment complex testified that the amount of water entering the Biron property and the direction of the water flow were the same in both instances. The parties' experts agreed that the March 16, 2009, event was a greater than 100-year event. It was thus considered to be the result of an " 'act of God' " for which City bore no responsibility.

Two nearby rain gauges recorded precipitation from the storms. One recorded a 16-year storm event on February 23, 2009. One recorded a 100-year storm event on February 23, 2009. The trial court found that the February 23, 2009, storm event was more consistent with a 100-year frequency storm.

The flooding on the Biron property was not caused by City's poor maintenance of the system. The trial court found the flooding was caused by a storm event that was akin to a 100-year event, which overwhelmed both natural watercourses and storm drain infrastructure, causing water to backup onto the street adjacent to the Biron property, to surcharge[3] through the storm drain inlet on the Biron property, and to run overland, finding the lowest path downstream via another adjacent street. The water from the adjacent streets entered the Biron property. The trial court also found that a cyclone and

---

[3] A drain surcharges when water gushes upward and out rather than taking drainage water in.

a wood fence, as well as railroad ties placed on the Biron property impeded downstream draining.

The trial court ruled in favor of City on both the inverse condemnation and dangerous condition of public property causes of action. In analyzing the inverse condemnation cause of action, the court applied the "rule of reasonableness" set forth in *Locklin v. City of Lafayette* (1994) 7 Cal.4th 327, 362 (*Locklin*). Pursuant to *Locklin*, the trial court analyzed the overall public purpose being served by the improvement, the degree to which the plaintiffs' loss was offset by reciprocal benefits, the availability to the public entity of feasible alternatives with lower risks, the severity of plaintiffs' damage in relation to risk-bearing capabilities, the extent to which damage of the kind plaintiffs sustained is generally considered as a normal risk of land ownership, and the degree to which similar damage is distributed at large over other beneficiaries of the project or is peculiar only to plaintiffs.

The trial court also considered five factors set forth in *Albers v. County of Los Angeles* (1965) 62 Cal.2d 250 (*Albers*): (1) whether the damage if reasonably foreseeable, would have entitled the property owners to compensation; (2) the likelihood of public works not being engaged in because of unforeseeable direct damage to property; (3) whether the damage was the proximate result of the work as deliberately planned and carried out; (4) whether the damage can better be absorbed, and with less hardship, by the taxpayers as a whole; and (5) whether the owner, if uncompensated, would contribute more than a proper share to the public undertaking.

Considering all of the above factors, the trial court concluded City did not act unreasonably in deciding to defer upgrades to the storm drainage system in the downtown area, and that City's decision to defer upgrades did not pose an unreasonable risk of harm to plaintiffs. The trial court also found plaintiffs did not prove that the storm drain system created a situation or risk that would not otherwise have been present, nor did they prove that the storm drain system exposed plaintiffs' property to a risk of flooding

6

that did not otherwise exist. The trial court characterized plaintiffs' claim as an argument that City did not do enough to protect their property.

As to plaintiffs' dangerous condition of public property cause of action, the trial court concluded the storm drain was designed to a 10-year storm capacity, and that it performed as expected. The court concluded that the risk identified by the 1993 Study was of nuisance flooding, which did not create a substantial risk of injury to members of the general public. It also weighed the likelihood and seriousness of the potential injury against the practicality and cost of protecting against the risk of injury and concluded that any failure to take steps to protect against the risk of injury was reasonable.

DISCUSSION

I

Inverse Condemnation

A. Rule of Reasonableness versus Strict Liability

Plaintiffs argue the applicable standard of liability for inverse condemnation under these facts is strict liability, and that the trial court erred in applying a rule of reasonableness. Plaintiffs argue there are only two exceptions to strict liability in an inverse condemnation action, and that neither exception is applicable here. Plaintiffs claim the only two exceptions to the rule of strict liability are: (1) where the public entity as an upper riparian owner would otherwise be privileged to drain surface water into a natural watercourse, and (2) where the public agency undertakes a flood control project to relieve from flooding lands historically subject to flooding. Plaintiffs argue the exceptions do not apply here because City's storm drain system did not discharge surface waters into a natural watercourse, and it was not a flood control project for the protection of lands that were historically subject to flooding.

The question of whether to apply a standard of reasonableness is a legal issue we review de novo. (*Gutierrez v. County of San Bernardino* (2011) 198 Cal.App.4th 831, 844.) We shall conclude that the storm drain system was a method of flood control that

7

was designed to divert potentially dangerous natural water flow and protect property, including plaintiffs' property, against potential flooding.  Although plaintiffs' attempt to strictly narrow the application of the rule of reasonableness, its application is not as narrow as they claim, and application of the rule in this situation is consistent with public policy.

Inverse condemnation cases originally were analyzed with reference to traditional tort and property law concepts under the assumption that inverse condemnation liability tracked private party liability.  (*Bunch v. Coachella Valley Water Dist*. (1997) 15 Cal.4th 432, 439 (*Bunch*).)  The Supreme Court changed this assumption in *Albers, supra,* 62 Cal.2d 250, which held that a property owner may recover just compensation from a public entity for "any actual physical injury to real property proximately caused by [a public] improvement as deliberately designed and constructed . . . whether foreseeable or not."  (*Id.* at pp. 263-264.)

*Albers, supra*, 62 Cal.2d 250, recognized two exceptions to the rule of strict liability:  (1) where the damages were inflicted in the proper exercise of the public entity's police power, and (2) where the public entity had a common law right to inflict damage, as where an upper riparian owner is privileged to protect against the common enemy of floodwaters.  (*Bunch, supra*, 15 Cal.4th at pp. 440-441.)  This second exception is known as the "common enemy doctrine."  (*Id.* at p. 441.)  It "holds that as an incident to the use of his own property, each landowner has an unqualified right, by operations on his own land, to fend off surface waters as he sees fit without being required to take into account the consequences to other landowners, who have the right to protect themselves as best they can."  (*Keys v. Romley* (1966) 64 Cal.2d 396, 400.)

*Belair v. Riverside County Flood Control Dist*. (1988) 47 Cal.3d 550 (*Belair*), represented a change in the analysis of a public entity's liability in inverse condemnation where, under *Albers, supra*, 62 Cal.2d 250, the public entity had a common law right to inflict damage under the common enemy doctrine.  (*Belair, supra*, at p. 563.)  *Belair*

8

involved a levee failure after a series of heavy storms. (*Id*. at p. 555.) *Belair* reasoned that while strict inverse condemnation liability might not be appropriate in the case of public flood control improvements, such improvements should not be cloaked with the same immunity as private flood control measures. (*Id*. at p. 564.) *Belair* adopted a rule of reasonableness in such situations, which balanced public need against the gravity of private harm. (*Id*. at p. 566.)

*Belair* adopted a rule of reasonableness rather than one of absolute liability because absolute liability would discourage beneficial flood control improvement, but would still compensate for losses that were unfairly incurred. (*Belair, supra*, 47 Cal.3d at p. 565.)

The Supreme Court has since followed the *Belair* rule of reasonableness, refining its application in *Locklin, supra*, 7 Cal.4th 327, and *Bunch, supra*, 15 Cal.4th 432.

*Locklin, supra*, 7 Cal.4th at page 337, held that the rule of reasonableness applies when alterations or improvements on upstream property discharge an increase of surface water into a natural watercourse, and the increased volume causes downstream property damage. In *Locklin*, the plaintiffs owned property that extended into a natural watercourse. (*Id*. at pp. 338-339.) The watercourse began carrying more water because of upstream development, and the larger volume of water eroded the plaintiffs' property. (*Id*. at p. 339.) The plaintiffs sued the City of Lafayette, alleging the failure to maintain the storm drainage system caused the erosion. (*Id*. at pp. 339-340.)

Although *Locklin* involved a natural watercourse, it made two pronouncements that are applicable here. First, it stated that a landowner's conduct in using or altering property in a manner affecting the discharge of surface waters onto adjacent property is subject to a test of reasonableness. (*Locklin, supra*, 7 Cal.4th at p. 351.) This test provides that " '[n]o party, whether an upper or a lower landowner, may act arbitrarily and unreasonably in his relations with other landowners and still be immunized from all liability.' " (*Ibid*.) Second, with the adoption of the reasonable use test for surface

9

waters, there is no valid reason for distinguishing between surface waters and those that flow through a natural watercourse with respect to the obligations of the respective owners. (*Id*. at p. 352.) *Locklin* held that the rule of reasonableness was applicable in the discharge of surface waters whether the water is discharged onto the land of an adjoining owner or into a natural watercourse. (*Id.* at p. 357.)

In *Bunch, supra*, 15 Cal.4th 432, a water district owned flood control facilities consisting of a levee, dike, and channel, designed to protect property, including the plaintiffs' property, from historical flooding. (*Id*. at p. 437.) The facilities failed during a tropical storm when floodwater overtopped the dike and levee, leading to the flooding of the plaintiffs' property. (*Id*. at p. 438.) The plaintiffs argued that the rule of reasonableness should apply only where a party would have been privileged under the common law common enemy doctrine to divert floodwaters to the property of another. (*Id*. at p. 447.) However, the Supreme Court agreed with the Court of Appeal, which opined that *Belair's* rule of reasonableness "applied to all cases involving unintentional water runoff, whether they involved facilities designed to keep water within its natural course or designed to divert water safely away from a potentially dangerous natural flow." (*Bunch, supra,* at p. 439.)

Plaintiffs cite two cases, *Yee v. City of Sausalito* (1983) 141 Cal.App.3d 917 and *Marin v. City of San Rafael* (1980) 111 Cal.App.3d 591, that they claim are "factually analogous" in support of their argument that the correct standard of liability for cases involving municipal storm drain improvements is strict liability. They overlook the fact that the California Supreme Court disapproved both cases in *Bunch, supra*, 15 Cal.4th at pages 447-448. In response to the *Bunch* plaintiffs' assertion that the applicable standard should be strict liability because diversion of waters from their natural course was not a privileged activity at common law, the Supreme Court responded that those cases were "pre-*Belair* cases that . . . applied an absolute liability standard to flood control cases involving the diversion of surface or floodwaters from their natural channel or drainage."

10

(*Id.* at p. 447.) The Supreme Court held that the reasonableness rule should be extended to cases involving the failure of flood control measures designed to divert potentially dangerous natural water flow. (*Id*. at p. 449.)

We thus reject the first part of plaintiffs' contention--that the rule of reasonableness applies only where surface waters are discharged into a natural watercourse or the result of a flood control project for the protection of lands that were historically subject to flooding. We next consider the second part of plaintiffs' contention.

*Bunch* represents an expansion of the rule of reasonableness set forth in *Belair* and *Locklin* beyond the context of flood control improvements along natural watercourses. *Bunch* applied the rule of reasonableness even though the water district had diverted and rechanneled the water. (*Bunch, supra*, 15 Cal.4th at p. 447.) However, the plaintiffs' property had been subject to historical flooding, thus the Birons argue here that *Bunch* must be viewed narrowly as holding that the rule of reasonableness applies only if the plaintiff's property was historically subject to flooding, and there was no evidence of historical flooding here.

*Bunch* should not be read so narrowly. First, the actual holding was that the "reasonableness test applies to cases involving public flood control works that cause physical damage to private property," and "that courts should use [the *Belair* and *Locklin*] factors in cases where a public entity's flood control measures, designed to protect against potentially dangerous periodic flooding, cause property damage." (*Bunch, supra*, 15 Cal.4th at p. 454.) Thus, the holding purports to apply more broadly to measures designed to protect against *potential* flooding than to measures designed to protect against *historical* flooding. *Bunch* recognizes that it is applying ". . . *Belair's* reasonableness rule to cases involving the failure of flood control measures designed to divert potentially dangerous natural water flow." (*Id*. at p. 449.) The trial court

11

specifically found that the storm drain facilities here are a means of surface water and flood control.

Also, *Bunch* indicated *Belair* and *Locklin* are not to be narrowly interpreted. In response to the Bunches' argument that the rule of reasonableness should apply only where the public entity's actions would have been privileged under common law, *Bunch* responded that "*Belair* warned against limiting application of its rule to cases involving previously privileged conduct." (*Bunch, supra*, 15 Cal.4th at p. 448.) *Bunch* stated, "*Belair's* dictum indicates that the court believed its analysis could apply to all flood control cases involving unintended property damage." (*Ibid.*)

In considering inverse condemnation liability, courts must balance the interests of property owners, who should not be required to contribute more than their fair share to the public undertaking, with the "possibility that imposing open-ended liability on public entities charged with creating and maintaining flood control improvements will discourage the development of needed public works." (*Bunch, supra,* 15 Cal.4th at pp. 450, 449.) That a certain harm is foreseeable does not necessarily mean the public entity is unreasonable in failing to protect against it if the probability, frequency, and magnitude of the damage is low in relation to the cost and ability to protect against the harm. (*Ibid.*)

*Bunch* predicted the circumstances of this case when it held, "the placement, design, and construction of even the most effective system inherently involve a complex balancing of interests and risks. Whatever choice the responsible agency makes will necessarily affect the patterns of flooding in the event the project fails, and will almost certainly increase certain risks in order to reduce others. The dangers posed to individual lands by the failure of any public flood control project are 'potentially enormous' and sometimes deserve compensation. However, strict and 'open-ended' liability for the failure of a project whose overall design, construction, operation, and maintenance was 'reasonable' would unduly deter the development of these vital bulwarks against common disaster. [Citation.] [¶] In the context of inverse condemnation, therefore, a

12

flood control agency does not necessarily exact 'disproportionate,' and thus compensable, contributions from particular landowners simply because it constructs adjacent flood control improvements that may alter how floodwaters will affect those landowners if the improvements fail to contain the flow." (*Bunch, supra,* 15 Cal.4th at p. 450.)

The trial court properly concluded that the correct standard in determining City's inverse condemnation liability was a reasonableness standard.

B.  Trial Court Properly Applied the Reasonableness Standard

The trial court considered eleven factors in concluding City acted reasonably. The factors were set forth in *Locklin, supra*, 7 Cal.4th 327. But, following *Locklin*, the Supreme Court and Courts of Appeal most often focus on six factors. (*Bunch*, *supra*, 15 Cal.4th at p. 454; *Gutierrez v. County of San Bernardino* (2011) 198 Cal.App.4th 831, 848; *Arreola v. County of Monterey* (2002) 99 Cal.App.4th 722, 739; *Paterno v. State of California* (1999) 74 Cal.App.4th 68, 83; contra, *Skoumbas v. City of Orinda* (2008) 165 Cal.App.4th 783, 792.) We find the six *Locklin* factors to be the most probative of a determination of reasonableness. These factors are:  " '(1) The overall public purpose being served by the improvement project; (2) the degree to which the plaintiff's loss is offset by reciprocal benefits; (3) the availability to the public entity of feasible alternatives with lower risks; (4) the severity of the plaintiff's damage in relation to risk-bearing capabilities; (5) the extent to which damage of the kind the plaintiff sustained is generally considered as a normal risk of land ownership; and (6) the degree to which similar damage is distributed at large over other beneficiaries of the project or is peculiar only to the plaintiff.' " (*Gutierrez v. County of San Bernardino, supra,* at p. 848.)

We review the court's factual findings that City acted reasonably under the substantial evidence standard. (*Gutierrez*, *supra*, 198 Cal.App.4th at p. 843.) Plaintiffs do not claim there was no substantial evidence to support the trial court's factual findings. Instead, they argue against the way the trial court applied the rule of

13

reasonableness. "The application of the appropriate legal standard to the facts properly found by the trial court is a legal question." (*Id.* at p. 844.)

### 1. *Overall Public Purpose*

We agree with the trial court that an important public purpose was served by the storm drain system, which was constructed to control surface water and flooding. The system did not fail, but was unable to drain the amount of water entering the system. Nevertheless, there was a benefit to having some storm drain capacity that would prevent some flooding.

### 2. *The Degree to Which Plaintiffs' Loss is Offset by Benefits*

As the trial court stated, the extent of plaintiffs' damage is unknown because the damages phase of the trial was bifurcated. However, plaintiffs undoubtedly have benefited from the storm drain system, even though it was inadequate in this instance to prevent flooding to plaintiffs' property.

### 3. *Availability to Public Entity of Feasible Alternatives with Lower Risks*

There was evidence that even if funding had been available, the downtown area was a low priority for an upgrade in capacity because the need was greater elsewhere. Additionally, the recommended design flow upgrade for most of the facilities at issue was for a 25-year storm. Even if the upgrades had been made, flooding may have resulted from the storm in question because it exceeded a 25-year storm.

### 4. *Severity of Plaintiffs' Damage in Relation to Risk-Bearing Capabilities*

The trial court concluded plaintiffs could have taken the same steps as the adjacent property owners to mitigate the risk of flooding, i.e., purchasing flood insurance and installing floodgates. The trial court concluded that this would not have been an enormous burden compared to the cost of upgrading the storm drain system to a level that would have prevented the flooding. We agree.

14

*5. Extent to Which Damage is Normal Risk of Land Ownership*

Any property is subject to some risk for flooding when a particularly strong storm exceeds the storm drain capacity. The risk may be greater depending on the location and surroundings of the property. A property at the lowest point of a watershed is more likely to flood than one at a higher point. Flooding may also depend on the path of uncontained surface waters as they travel to the lowest point, and whether the property is in that path. Although there was some normal risk of flooding of the property given its location, the amount of flooding in this instance may well have been abnormal.

*6. Whether Similar Damage is Distributed at Large or Peculiar to Plaintiffs*

The trial court found that no evidence was presented whether other landowners suffered damage as a result of the storm. There was evidence that the adjacent property owner had incurred the expense of protecting his property by installing a brick wall and floodgates and by purchasing flood insurance. There was no evidence City made a conscious decision to flood plaintiffs' property in order to spare other properties.

The trial court properly applied the rule of reasonableness in this case to conclude that City acted reasonably in not increasing the capacity of its storm drain system.

C. Substantial Causation

Although the trial court did not expressly rule that the storm drainage system was not a substantial cause of the flooding, its findings lead to a conclusion of no substantial causation. We agree that plaintiffs failed to prove the storm drainage system was a substantial cause of their damage because the system did not fail, it was simply overwhelmed by the amount of water the storm deposited into the system.

*Belair* recognized that inverse condemnation liability requires a showing of proximate cause, and "in order to establish a causal connection between the public improvement and the plaintiff's damages, there must be a showing of ' "a substantial cause-and-effect relationship excluding the probability that other forces *alone* produced the injury." [Citations.]' [Citation.]" (*Belair, supra*, 47 Cal.3d at p. 559.) *Belair*

15

proceeded to describe the factual scenario here as an example of a situation *lacking* the element of substantial causation. *Belair* stated that where a rainstorm merely contributes to the injury, proximate cause is established if the injury occurred in substantial part because the improvement failed to function as intended. (*Id*. at pp. 559-560.) "The public improvement would cease to be a substantial contributing factor, however, where it could be shown that the damage would have occurred even if the project had operated perfectly, *i.e., where the storm exceeded the project's design capacity.* In conventional terminology, such an extraordinary storm would constitute an intervening cause which supersedes the public improvement in the chain of causation." (*Id*. at p. 560, italics added.)

In the present case, the public improvement did operate perfectly, but the storm exceeded the design capacity. The trial court found that the storm event on February 23, 2009, "overwhelmed the natural watercourse . . . and overwhelmed the storm drain infrastructure . . . ." This caused surface water to backup onto the adjacent road, Railroad Avenue, caused the storm drain inlet on plaintiffs' property to surcharge, and caused surface water to find the lowest path downstream via Court Street, another adjacent road. It found that City's storm drain pipes were operating free of any obstructions. It found that the storm drain system did not fail, and that it performed as designed on a 10-year storm design.[4] However, the system was overwhelmed with water because the storm was consistent with a 100-year storm, rather than a 10-year storm.

The trial court found that plaintiffs did not prove the storm drain system created a situation or a risk that would not otherwise have been present, nor did they prove that the storm drain system exposed their property to a risk of flooding that did not otherwise

_____

[4] A witness for City testified the facilities were constructed for a 10-year design flow.

16

exist. The court found plaintiffs' argument to be that the storm drain system simply did not do enough to protect their property.

Belair accurately predicted the facts of this case, i.e., the project operated perfectly but the storm exceeded the project's design capacity, and concluded that under such facts the extraordinary storm would be a superseding cause, cutting off the public entity's liability for inverse condemnation. (*Belair, supra*, 47 Cal.3d at p. 559-560.)

Plaintiffs cite this court's decision in *Akins v. State of California* (1998) 61 Cal.App.4th 1, 43-47 (*Akins*), for the proposition that if the public improvement contributes to the damage, another concurrent cause such as an extraordinarily large storm, is not a superseding cause. However, the facts of this case align perfectly with the description of a superseding cause in *Belair* and are dissimilar to the facts in *Akins*. *Akins* involved "an intentional use of plaintiffs' properties as a retention basin, thereby causing flooding to lands which were arguably not historically subject to flooding, in order to protect other property. Thus, the fact that design capacity was exceeded would not make the rainstorm the sole cause of the damage." (*Akins, supra*, 61 Cal.App.4th at p. 45.) *Akins* was a quintessential inverse condemnation case, because the flood control project there was designed to flood some properties in order to save others. The fundamental policy behind the constitutional requirement of just compensation is the consideration " ' "whether the owner of the damaged property if uncompensated would contribute more than his proper share to the public undertaking." In other words, the underlying purpose of our constitutional provision in inverse -- as well as ordinary -- condemnation is "to distribute throughout the community the loss inflicted upon the individual . . . ." ' [Citation.]" (*Belair, supra*, 47 Cal.3d at p. 558.)

*Akins, supra*, 61 Cal.App.4th 1, recognized that an extraordinary storm would constitute a superseding cause where "accidental flooding from natural forces exceeding design capacity breach[ed] a project designed to reduce the risk of harm from natural forces." (*Id*. at p. 45.) The situation is analogous to floodwaters overtopping a levee

17

because they exceed the capacity of the levee.  (*Id*. at p. 44.)  Here, the storm exceeded the capacity of the storm drain system, which was constructed to reduce flooding from rainwater, causing the drains to overflow.

Nature was a superseding cause of the flooding, and absent proof of substantial causation, defendant has no liability in inverse condemnation.

## II
## Dangerous Condition of Public Property

Government Code section 835 provides that a public entity is liable for injury caused by a dangerous condition of public property if:  (1) the property was in a dangerous condition at the time of the injury, (2) the dangerous condition proximately caused the injury, (3) the dangerous condition created a reasonably foreseeable risk of the kind of injury that was incurred, and (4) a public employee acting within the scope of employment negligently or wrongfully created the dangerous condition, or the public entity had sufficient notice of the dangerous condition to have protected against it.

Even if the plaintiff can establish that a dangerous condition of public property existed, a public entity is not liable for damage from a dangerous condition if the act or omission that created the condition was reasonable, or if the action the entity took or failed to take to protect against the risk was reasonable.  (Gov. Code, § 835.4.) Reasonableness is a question of fact for the trier of fact, and is determined by weighing the probability and gravity of potential injury against the practicability and cost of the action.  (Gov. Code, § 835.4; *De La Rosa v. City of San Bernardino* (1971) 16 Cal.App.3d 739, 749.)

The trial court, acting as trier of fact, found that no dangerous condition existed because neither the storm drain system, nor the decision to defer upgrades to the system created a substantial risk of injury to members of the general public.  The trial court further found that even if the storm drain system was a dangerous condition, City's conduct in not protecting against the risk of injury was reasonable.

18

We review the trial court's factual findings under a substantial evidence standard. (*Biagini v. Beckham* (2008) 163 Cal.App.4th 1000, 1010.) We presume the trial court's factual findings are supported by the record. (*Akins, supra*, 61 Cal.App.4th at p. 36.) Plaintiffs do not argue that the evidence was insufficient to support the trial court's conclusions that neither the storm drain system nor the decision to defer upgrades to the storm drain system created a substantial risk of injury to the general public, or that City's conduct in not protecting against the risk of injury was reasonable. Instead, they merely argue that City had notice that the storm drain facilities were deficient.

Plaintiffs completely ignore the fact that the trial court found no liability for a dangerous condition in part because City was not unreasonable in its decision not to upgrade the system. The determination of reasonableness required the court to weigh "the probability and gravity of potential injury to persons and property foreseeably exposed to the risk of injury against the practicability and cost of taking alternative action that would not create the risk of injury or of protecting against the risk of injury." (Gov. Code, § 835.4, subd. (a).) The issue is, as indicated, one of fact for the trier of fact, which we review for substantial evidence.

The 1993 Study indicated City ranked the downtown area (where plaintiffs' property is located) as the lowest priority because the majority of problems in that area consisted of nuisance flooding (less than 2 feet deep, with low velocities) in the streets. The trial court found that the Study estimated the cost of improvements to the deficient storm drain facilities in the downtown area to be $7.5 million, and the cost for all other deficient storm drain facilities throughout the city to be approximately $14.6 million, a finding plaintiffs do not dispute. The trial court also found that in the early 2000's, City considered the storm drain utility to be grossly underfunded and lacking in available funds for improvement of the system, a finding plaintiffs do not dispute.

Because there was evidence that the risk of injury was small in relation to the cost of repairs, there was substantial evidence to support the trial court's conclusion that City

acted reasonably in its decision not to upgrade the system.  Thus, even if the trial court had concluded the storm drain system was a dangerous condition of public property, there would be no liability.

## DISPOSITION

The judgment is affirmed.  Defendant City shall recover costs on appeal.


      BLEASE            , J.


We concur:


    RAYE             , P. J.


    BUTZ             , J.