Filed 8/18/25  Sanders v. City of Long Beach CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| LESLIE SANDERS, | B334226 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. 19STCV43406) |
| v. | |
| CITY OF LONG BEACH, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mark C. Kim, Judge.  Affirmed.

Leslie Sanders in pro. per., for Plaintiff and Appellant.

Dawn McIntosh, City Attorney, and Jennifer J. Moon, Deputy City Attorney, for Defendant and Respondent.

_____

In 2019, Leslie Sanders's townhome flooded during a severe storm. He and other townhome residents sued the City of Long Beach (Long Beach) alleging it improperly maintained its stormwater pump stations by failing to have mitigation measures in place in case its stormwater pumps lost power during a flood event, as happened during the 2019 storm. After a bench trial, the court ruled in Long Beach's favor on all five causes of action. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *Pump Station 13 Goes Offline During the 2019 Storm*

In February 2019, a major rainstorm caused flooding in parts of Long Beach, including the Orangewood Village Townhomes (Orangewood Village), where Sanders and the other eight plaintiffs in this case (collectively, the residents) own seven units in total.[1] The parties stipulated that the residents' units and their personal property were damaged by the floodwaters from the Los Angeles River.

During the storm, pump station 13—owned by Long Beach and powered by the utility company Southern California Edison (Edison)—lost power and did not have a backup generator. Pump stations are designed to move stormwater away from streets and properties and to prevent flooding. Once water reaches a set level in a station, pumps activate one by one to discharge the water to a drainage point. There are 23 pump stations in Long Beach. Pump station 13 is the second largest, covering roughly 900 to 1,000 acres. It houses seven pumps.

---

[1]    The other plaintiffs are not parties to this appeal.

In February 2019, Long Beach had a third-party contractor monitoring the pump stations continuously. If a pump failed, an alarm sounded to notify personnel. When the pumps lost power, they would shut down in a "hard off" mode and had to be manually restarted. Of the 23 stations, only one was equipped with backup power.

B.     *The Complaint and the Trial*

In July 2020, the residents filed an amended complaint against Long Beach and Edison, alleging negligence, premises liability, inverse condemnation, public and private nuisance, trespass, and violations of the Public Utility Code.[2] They claimed Long Beach and Edison negligently maintained pump station 13, leading to damage to their homes from floodwaters that were not discharged while the pump was offline.

The court held a bench trial over two days in July 2023. The trial lasted about four and a half hours; each side called one witness.

1.     *The residents' witness*

The residents called Max Vahid, a civil engineer with experience in flood control engineering. He testified that Long Beach should have provided backup power—such as a portable or permanent generator—for pump station 13 during the 2019 storm. He based his opinion on a 2014 report on Long Beach pump stations; a deposition by Arthur Cox, the manager of the

---

[2]     At trial, the residents dismissed their sixth cause of action for trespass. The residents brought the seventh cause of action, for violation of the Public Utility Code, only against Edison, which successfully moved for summary judgment and was dismissed from the case before trial.

Public Service Bureau in the Long Beach Department of Public Works; and a site visit to the area around the pump station.

Vahid believed Long Beach had advance notice of the storm and should have mitigated the risk of power failure. He explained that most modern pump stations include diesel or natural gas backup generators. As alternatives, he suggested Long Beach could have rented a generator for the duration of the storm or stationed personnel nearby to manually restart the pump. Vahid estimated renting a generator would cost between $1,000 and several thousand dollars per day, while installing a permanent backup generator could cost $1 to 2 million. He did not know how many pump stations there were in Long Beach or how many stations lacked backup generators.

Vahid said the 2014 report recommended new pumps, backup generators, and upgrades to the pumps' electronic telecommunication system (SCADA system). Of those recommended improvements, backup generators were the most critical.

Because pump station 13 lacked remote capabilities, staff had to manually restart it after the power returned. Vahid recommended modernizing the SCADA system to allow remote activation of pump station 13. He believed this would have cost less than installing a generator or new pumps, though he could not estimate how much less.

Vahid stated that although the power outage affecting pump station 13 lasted about one minute, the pump remained off for over an hour and a half. Vahid could not provide the source of the information that the outage lasted one minute.

Vahid testified he had no information about Long Beach's budget. He acknowledged he had no information about how the

4

city responded to the 2014 report or how it allocated resources during the storm. He did not dispute evidence that city staff were responding to emergencies citywide during the storm. He did not fault Long Beach for using older pumps or for designing them to shut down for safety in power outages.

2. *Long Beach's witness*

On the second day of trial, Long Beach called Cox, who managed a $21 to 22 million operating budget that the Public Services Bureau had for its four divisions: street maintenance (including the 23 pump stations), traffic operations, facilities, and administration. Cox was responsible for Long Beach's pump stations during the February 2019 storm.

Cox explained that Long Beach typically monitors weather forecasts to determine whether additional contractors are needed for a weather event. He stated the February 2019 weather forecast did not indicate a major storm was expected, but on the day in question, a large rain cell unexpectedly stalled over Long Beach.

Although 30 to 35 people worked in the street maintenance division of the Public Service Bureau, Cox explained only four— including Cox—had the training to manage issues at pump stations due to the associated security and technical issues. When pump station 13 went offline around 12:45 or 1:00 p.m., Cox dispatched Agnello,[3] one of the equipment operators with expertise, from another station. Although pump failures during storms were rare, Long Beach had a protocol in place to decide which employees to dispatch. Other Long Beach staff were busy with tasks like clearing storm drains and responding to downed

---

[3]     Agnello's first name is not in the record.

5

trees.

It took Agnello 30 to 45 minutes to drive to station 13. When Agnello arrived, he reported the pumps and lights were off, confirmed the station was without power, and notified Edison. Shortly after, the lights returned and Agnello restarted the pumps. Cox estimated the total outage lasted about an hour and 15 minutes.

After the pumps restarted, Long Beach inspected the station and brought in engineers to test the system. No one—city staff or outside contractors—identified any deficiencies. Cox opined that the pumps at pump station 13 went offline on the date in question due to an Edison power outage.

As to the maintenance of pump stations generally, Cox explained the stations are inspected monthly by contractors who clean, test, and report any problems with them. A January 2019 inspection of pump station 13 had not revealed any issues. Failures at the pump stations were "extremely rare." Cox recalled an incident in 2010, during which a pump was offline for about six hours, and a shorter incident in 2017. After the 2017 event, Cox recommended adding backup power at pump station 9, but not station 13. Cox was not aware of any damage to property resulting from the 2010 or 2017 events.

Cox testified that Long Beach began seeking federal funds in 2017 and 2018 to purchase backup generators. These capital improvements, he explained, were outside the city's operating budget. Long Beach typically relied on federal or state funding for large infrastructure projects. Cox estimated a backup generator for one pump station would cost about $2 million.

Cox noted the city had some portable generators that could be used at certain locations, like pump station 9, but the city

6

would need to rent equipment for others, including station 13. Long Beach had no portable generator powerful enough to run pump station 13. In 2010, Edison had rented a semi-truck-sized generator during the six-hour power outage.

Cox agreed with the conclusion of the 2014 report that it would be beneficial to install backup generators at the pump stations if funding became available. The report also recommended updating all SCADA systems. However, Cox testified that even with an upgraded SCADA system, the pumps would still require someone to manually restart them after a hard shutoff. For safety reasons, the hardware was designed to prevent automatic restart after power loss. Cox testified the city had not yet modernized the SCADA systems due to budget constraints but noted the pump stations were functional as they were.

No documents were admitted into evidence by either party.[4]

---

[4] The residents sought to introduce the 2014 report, but the trial court excluded it on hearsay grounds because it was prepared by a third-party contractor and there was no custodian to authenticate it as a business record.

Sanders filed three motions to augment the record on appeal with documents including his email correspondence with the Public Works Bureau and the Long Beach City Attorney, a 2005 storm water report of unknown origin, excerpts from Cox's deposition, and supplemental briefs by Sanders explaining the importance of these documents. However, the augmentation requests are not appropriate because none of these documents (many of which postdate the judgment) was ever introduced at trial. (See Cal. Rules of Court, rule 8.155(a)(1)(A) [party may move to augment record to include "[a]ny document filed or

3.  *The court's ruling*

The trial court ruled in favor of Long Beach on all five causes of action.  Neither party requested a statement of decision.

In its oral ruling, the court concluded that the residents' first two causes of action for common law negligence and premises liability failed because common law tort claims cannot be brought against a public entity.  The court noted the residents had failed to allege a cause of action under the Government Code regarding liability of a public entity for a dangerous condition.  The cause of action for public nuisance failed because the residents did not suffer harm distinct from the general public; rather, the flooding affected the entire surrounding area.

The court determined the residents did not prevail on their causes of action for inverse condemnation and private nuisance because Long Beach acted reasonably in its maintenance plan for pump station 13.  The court credited testimony that installing backup generators at each of the city's 22 stations was financially

lodged in the case in superior court"]; *In re Kenneth D.* (2024) 16 Cal.5th 1087, 1106 [" '[a]ugmentation does not function to supplement the record with materials not before the trial court' "].)  Even construing Sanders's motions as requests for judicial notice, "[s]imilar reasoning applies . . . : ' "Reviewing courts generally do not take judicial notice of evidence not presented to the trial court" absent exceptional circumstances.' " (*In re Kenneth D.*, p. 1106.)  Sanders identifies no exceptional circumstances justifying an exception.  And judicial notice extends only to the existence of documents—not to the truth of their contents.  (*In re K.M.* (2015) 242 Cal.App.4th 450, 456; see *Ross v. Seyfarth Shaw LLP* (2023) 96 Cal.App.5th 722, 746 ["recognizing inability to 'take judicial notice of the truth of the contents of the Web sites and blogs' "].)  The motions are denied.

infeasible, as the $44 million price tag (approximately $2 million for each pump station) was more than twice the operating budget of the whole department. The court noted that Long Beach had applied for federal funding to install backup generators at pump station 13.

The court found that renting portable generators was also not a feasible alternative, given staffing limitations and the need for manual reactivation—even with a modern automatic SCADA system. The court also found it impractical to station staff at each pump site and accepted Cox's assessment that the weather forecast had not predicted such an intense storm. The court further noted that while pump stations had experienced issues in 2010 and 2017, those incidents did not result in property damage.

The court credited Cox's testimony that he received notice of the power failure around 12:45 p.m., he then dispatched Agnello by about 12:50, and Agnello arrived at pump station 13 between 1:20 and 1:35, where power was still out until it was restored around 1:47 p.m. Even if the SCADA system had been updated as Vahid recommended, the court reasoned, it would have saved only about 10 minutes. The court concluded that Long Beach had not acted negligently or unreasonably, given the circumstances.

In September 2023, the court entered judgment for Long Beach. Sanders timely appealed.

## DISCUSSION

A. *Standard of Review*

"A judgment or order of a lower court is presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of its correctness." (*In re Marriage of Arceneaux*

9

(1990) 51 Cal.3d 1130, 1133; accord, *Kaushansky v. Stonecroft Attorneys, APC* (2025) 109 Cal.App.5th 788, 799.) The appellant carries "the burden to prove otherwise by presenting legal authority on each point made and factual analysis, supported by appropriate citations to the material facts in the record." (*Keyes v. Bowen* (2010) 189 Cal.App.4th 647, 655-656.) " '[U]nder the doctrine of implied findings, the reviewing court must infer, following a bench trial, that the trial court impliedly made every factual finding necessary to support its decision.' " (*Kaushansky*, at p. 799.) "Sections 632 and 634 [of the Code of Civil Procedure] . . . set forth the means by which to avoid application of these inferences in favor of the judgment," beginning with requesting a statement of decision. (*Arceneaux,* at p. 1133, fns. omitted; accord, *Kaushansky*, at p. 800.)

Ordinarily, where a party has not requested a statement of decision, the appellate court reviews the express and implied factual findings under the substantial evidence standard. (See *Michael U. v. Jamie B.* (1985) 39 Cal.3d 787, 792-793; *Shenefield v. Kovtun* (2024) 106 Cal.App.5th 925, 933-934.) However, where the trial court found the appellant failed to meet his or her burden of proof at trial, " ' "the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. [Citations.] Specifically, the question becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' " ' " (*Victaulic Company v. American Home Assurance Company* (2022) 80 Cal.App.5th 485, 505 (*Victaulic*).) " ' "We may not reweigh the evidence and are bound by the trial court's credibility determinations.

10

[Citations.] Moreover, findings of fact are liberally construed to support the judgment." ' " (*Tribeca Companies, LLC v. First American Title Ins. Co.* (2015) 239 Cal.App.4th 1088, 1102; accord, *Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 334 [" 'the determination of [any] conflicts and inconsistencies in . . . testimony are matters for the trial court to resolve' "]; *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 571 [" 'When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court.' "].) We review legal issues de novo. (See *Veiseh v. Stapp* (2019) 35 Cal.App.5th 1099, 1104; *Feresi v. The Livery, LLC* (2014) 232 Cal.App.4th 419, 425.)

B.      *Sanders Forfeited His Arguments on Appeal*

Sanders's briefs on appeal are replete with arguments based on facts that are not in the trial record. For instance, he asserts that pump station 13 had maintenance issues, relying in part on a 2005 report warning of hazardous pump conditions, but that report was not introduced into evidence at trial. He also challenges Cox's testimony that the Public Service Bureau's budget was $44 million (claiming it is over $500 million annually), but no witness disputed Cox's budget figures, and no documents with fiscal information were introduced into evidence. We must disregard Sanders's arguments to the extent they are based on evidence that is outside the record. (See *Citizens Opposing a Dangerous Environment v. County of Kern* (2014) 228 Cal.App.4th 360, 366 [" 'Factual matters that are not part of the appellate record will not be considered on appeal and such matters should not be referred to in the briefs.' "]; see *Princess*

11

*Cruise Lines, Ltd. v. Superior Court* (2009) 179 Cal.App.4th 36, 45 [factual assertions without citation to the record may be disregarded].)

In addition, in his opening brief Sanders includes scattered argument in the factual background section and, in the argument section, he often fails to support his arguments with pertinent authority or citation to the record, making his arguments difficult to discern. (See *Slone v. El Centro Regional Medical Center* (2024) 106 Cal.App.5th 1160, 1172 ["[B]y not citing to specific portions of the record . . . , [the appellant] has not carried his burden on appeal to show the purported error."]; *Lonely Maiden Productions, LLC v. GoldenTree Asset Management, LP* (2011) 201 Cal.App.4th 368, 384 [" 'If no citation "is furnished on a particular point, the court may treat it as waived." ' "].) Further, the factual summary section of his opening brief contains almost no record citations. (See Cal. Rules of Court, rule 8.204(a)(1)(C) [briefs must cite to volume and page number for any matter in the record].) Because Sanders's appellate briefs do not conform to appellate rules, he has forfeited his claims on appeal.[5]

---

[5] We acknowledge a self-represented litigant's understanding of the rules on appeal are, as a practical matter, more limited than an experienced appellate attorney's. Whenever possible, we do not strictly apply technical rules of procedure in a manner that deprives litigants of a hearing. However, we are required to apply the rules on appeal and substantive rules of law to a self-represented litigant's claims on appeal, just as we would to those litigants who are represented by trained legal counsel. (*Rappleyea v. Campbell* (1994) 8 Cal.4th 975, 984-985; accord, *County of Sacramento v. Singh* (2021) 65 Cal.App.5th 858, 861 [a self-represented litigant "is entitled to the same but no greater consideration than other litigants"].)

12

C.     *Sanders Has Not Shown Reversible Error*

Even if we did not consider his arguments forfeited, Sanders has not shown that the evidence compelled a result in his favor as a matter of law.  (See *Victaulic*, *supra*, 80 Cal.App.5th at p. 505.)  It appears that the gist of Sanders's argument is that the court erred in finding the residents did not prevail on their inverse condemnation and premises liability causes of action.  The trial court did not err.

1.     *Inverse condemnation*

Generally, "our state Constitution's just compensation clause requires that an owner of real property receive compensation for any actual physical injury to that property, whether foreseeable or not, that a public improvement, as deliberately designed and constructed, proximately caused." (*Bunch v. Coachella Valley Water Dist.* (1997) 15 Cal.4th 432, 440 (*Bunch*).)  However, one exception to this rule of strict liability is "in the 'unique' context of water law" in defending against "the 'common enemy' of floodwaters."  (*Id.* at p. 441.)  " "[W]ith respect to flood control projects, the public agency is liable only if its conduct posed an unreasonable risk of harm to the plaintiffs, and that unreasonable conduct is a substantial cause of the damage to plaintiff's property.  The rule of strict liability generally followed in inverse condemnation [citation] is not applicable in this context.' "  (*Id.* at p. 445, quoting *Locklin v. City of Lafayette* (1994) 7 Cal.4th 327, 367; see *Biron v. City of Redding* (2014) 225 Cal.App.4th 1264, 1276 (*Biron*) [reasonableness standard, not strict liability, applies in determining municipality's inverse condemnation liability for flood damage to private property when

13

rainfall during storm exceeded the capacity of the municipal storm drain system].)

"In considering inverse condemnation liability, courts must balance the interests of property owners, who should not be required to contribute more than their fair share to the public undertaking, with the 'possibility that imposing open-ended liability on public entities charged with creating and maintaining flood control improvements will discourage the development of needed public works.' " (*Biron*, *supra*, 225 Cal.App.4th at p. 1276; accord, *Bunch*, *supra*, 15 Cal.4th at pp. 449-450.) "That a certain harm is foreseeable does not necessarily mean the public entity is unreasonable in failing to protect against it if the probability, frequency, and magnitude of the damage is low in relation to the cost and ability to protect against the harm." (*Biron*, at p. 1276.) In assessing the reasonableness of the public agency's conduct, "the cost to the public entity of reasonable measures to avoid downstream damage" may be considered. (*Locklin v. City of Lafayette, supra*, 7 Cal.4th at p. 369; accord, *Bunch*, at p. 446.)

The reasonableness of Long Beach's conduct in maintaining pump station 13 was a question of fact to be determined by the trier of fact, here the trial court. (See *Biron*, *supra*, 225 Cal.App.4th at p. 1281.) Sanders has not demonstrated that the evidence he relies on was uncontradicted and left no room for the court to credibly find that Long Beach's maintenance plan for pump station 13 was reasonable.[6] (See *Victaulic*, *supra*, 80 Cal.App.5th at p. 505.)

---

[6] Because Sanders has not met his burden on appeal to demonstrate the trial court erred in finding Long Beach's

14

Although Vahid opined Long Beach should have provided a backup or portable generator, updated the SCADA system, or stationed personnel nearby to manually restart the pumps at station 13, the trial court credited Cox's testimony that those were not viable alternatives. The court relied on Cox's testimony that a backup generator would cost about $2 million per station, a figure with which Sanders's expert agreed. The court also relied on Cox's testimony that Long Beach's Public Service Bureau had a total operating budget of $21 to 22 million, and that installing generators at all 22 pump stations would cost $44 million, well beyond the Bureau's budget. Cox further explained Long Beach did not have a portable generator powerful enough to run pump station 13 and the power was not out for long enough to rent one. Moreover, even if Long Beach had updated the SCADA system to an automatic version, Cox testified staff would still need to manually reset the system due to built-in hardware safety features. Because the power was off when Agnello arrived, an automatic system in the "hard off" position would still need a manual restart and would have saved only a few minutes.[7] Cox

maintenance plan for pump station 13 was reasonable, we need not reach the issue whether Long Beach's flood control measures, including pump station 13, were a substantial cause of the damage to Sanders's property.

[7] Sanders contends the trial court erred in crediting Cox's timing of events on the day of the storm because Agnello's statements to Cox were hearsay. Sanders made no hearsay objection at trial and has therefore forfeited this argument. (See *K.C. Multimedia, Inc. v. Bank of America Technology & Operations, Inc.* (2009) 171 Cal.App.4th 939, 948-950 [to " 'preserve an issue for appeal, a party ordinarily must raise the objection in the trial court' "].)

15

explained the city had to send trained staff, like Agnello, to restart the pumps, and Cox stated other Long Beach staff were busy during the storm with tasks like clearing storm drains.

As for general maintenance, Cox described that contractors inspected each pump station monthly to ensure it functioned properly, clean out debris, and report any problems. The inspection of pump station 13 in the month before the storm had revealed no issues.

While Sanders challenges Cox's credibility, we are "bound by the trial court's credibility determinations." (*Tribeca Companies, LLC v. First American Title Ins. Co.*, *supra*, 239 Cal.App.4th at p. 1102.) Cox's testimony is sufficient to support the court's conclusion that Long Beach acted reasonably in maintaining its pumps. (See *Newman v. Casey* (2024) 99 Cal.App.5th 359, 375 [the testimony of even one witness may support a trier of fact's finding].)

In attempting to shift fault to Long Beach for the pumps going offline, Sanders asserts there was no power outage, and alludes to deposition testimony from an Edison representative that he contends supports his assertion. At trial, the residents unsuccessfully sought to introduce that deposition testimony. First, they sought to rely on it to impeach Cox's testimony, but the court sustained Long Beach's objection because Cox could not properly be impeached with another witness's deposition testimony. (See Civ. Proc. Code, § 2025.620, subd. (a) ["Any party may use a deposition for the purpose of contradicting or impeaching the testimony of the *deponent* as a witness," italics added].) Second, the residents sought to admit the deposition testimony under Code of Civil Procedure section 2025.620, subdivision (b), which provides: "An adverse party may use for

16

any purpose, a deposition of a party to the action, or of anyone who at the time of taking the deposition was an officer, director, managing agent, employee, agent, or designee under Section 2025.230 of a party." However, the court found that because Edison was no longer a party, that exception did not apply. Sanders offers no legal argument to challenge that ruling, citing only the Federal Rules of Evidence, which do not apply in California state court. Accordingly, Sanders points to no competent evidence to dispute Cox's testimony that a power outage caused the water pumps at station 13 to stop operating.

The trial court properly ruled in favor of Long Beach on the inverse condemnation cause of action.

2.      *Premises liability/dangerous condition*

Sanders also contends that the trial court erroneously ruled against the residents on their common law cause of action for "premises liability" for a "dangerous condition."

"The nature and extent of a public entity's liability for an injury suffered on its property is governed by statute, specifically the Government Claims Act. '[A] public entity is not liable for injuries except as provided by statute ([Gov. Code,] § 815) and . . . [Government Code] section 835 sets out the exclusive conditions under which a public entity is liable for injuries caused by a dangerous condition of public property."[8] (*Metcalf v. County of*

---

[8]      To the extent Sanders contends the court erred in finding the residents' common law claim of negligence was not viable, the trial court correctly determined Long Beach, as a public entity, could not be sued for common law negligence. (See Gov. Code, § 815, subd. (a); *Doe v. Los Angeles County Dept. of Children & Family Services* (2019) 37 Cal.App.5th 675, 686 [a common law negligence claim may not be asserted against public entities

17

*San Joaquin* (2008) 42 Cal.4th 1121, 1129 (*Metcalf*); accord, *Tansavatdi v. City of Rancho Palos Verdes* (2023) 14 Cal.5th 639, 652-653.)

"The limited and statutory nature of governmental liability mandates that claims against public entities be specifically pleaded." (*Brenner v. City of El Cajon* (2003) 113 Cal.App.4th 434, 439.)  "Since the duty of a governmental agency can only be established by statute, the statute claimed to establish the duty must at least be identified in the complaint." (*Searcy v. Hemet Unified School Dist.* (1986) 177 Cal.App.3d 792, 802; accord, *Becerra v. County of Santa Cruz* (1998) 68 Cal.App.4th 1450, 1458 [a " 'litigant seeking to plead the breach of a mandatory duty [by a public agency] must specifically allege the applicable statute or regulation' "].)  The residents' complaint did not allege a statutory basis for premises liability, and "[n]either a trial court nor a reviewing court in a civil action is obligated to seek out theories plaintiff might have advanced, or to articulate for him that which he has left unspoken." (*Metcalf*, *supra,* 42 Cal.4th at p. 1131.)  Thus, the trial court properly determined the residents could not prevail on their premises liability cause of action against Long Beach.

Even if we could construe the complaint as alleging a cause of action against a public agency for a dangerous condition under Government Code section 835, the trial court's findings on the

---

because they are not liable for a tort injury arising from an act or omission except as provided by statute].)

Sanders has not made a cognizable argument on appeal regarding the residents' claims for public and private nuisance.

reasonableness of Long Beach's maintenance would have doomed the residents' claim.

"To establish public entity liability for injury caused by a dangerous condition[9] of its property, '[Government Code section 835] requires a plaintiff to prove, among other things, that either of two conditions is true: "(a) A negligent or wrongful act or omission of an employee of the public entity within the scope of his employment created the dangerous condition; or [¶] (b) The public entity had actual or constructive notice of the dangerous condition under Section 835.2 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition." ' " (*Metcalf, supra,* 42 Cal.4th at p. 1130; accord, *Kim v. County of Monterey* (2019) 43 Cal.App.5th 312, 324.)

"Even if the plaintiff can establish that a dangerous condition of public property existed, a public entity is not liable for damage from a dangerous condition if the act or omission that created the condition was reasonable, or if the action the entity took or failed to take to protect against the risk was reasonable." (*Biron, supra*, 225 Cal.App.4th at p. 1281; see Gov. Code, § 835.4, subds. (a), (b).) "Reasonableness is a question of fact for the trier

---

9        "The [Government Claims] Act defines a ' "[d]angerous condition" ' as 'a condition of property that creates a substantial (as distinguished from a minor, trivial or insignificant) risk of injury when such property or adjacent property is used with due care in a manner in which it is reasonably foreseeable that it will be used.' Public property is in a dangerous condition within the meaning of [Government Code] section 835 if it 'is physically damaged, deteriorated, or defective in such a way as to foreseeably endanger those using the property itself.' " (*Cordova v. City of Los Angeles* (2015) 61 Cal.4th 1099, 1105; see Gov. Code, § 830, subd. (a).)

of fact, and is determined by weighing the probability and gravity of potential injury against the practicability and cost of the action." (*Biron*, at p. 1281 [upholding trial court's finding city was not liable for alleged dangerous condition created by storm drain system in part because the city was not unreasonable in its decision not to upgrade the system, based on prohibitive costs]; see Gov. Code, § 835.4, subds. (a), (b).)

As discussed, the trial court determined that Long Beach reasonably concluded that it could not afford to install permanent backup generators, and it was infeasible to install generators or staff temporarily at each of the 22 pump stations. Sanders has not shown that contrary evidence compelled a result in his favor as a matter of law.[10]

## DISPOSITION

The judgment is affirmed. Sanders' motions to augment the record are denied. Long Beach is entitled to its costs on appeal.


STONE, J.

We concur:


SEGAL, Acting P. J.          FEUER, J.

---

[10]     Sanders also accuses Cox and Long Beach's counsel of perjury, fraud, and misleading the court. He offers no citations to the record or legal authority to support these serious allegations, and we disregard them.

20